

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-23-00346-CR

---

Moises Galvan, Appellant

v.

The State of Texas, Appellee

---

On Appeal from the 168th District Court
El Paso County, Texas
Trial Court No. 20170D00969

---

## SUBSTITUTE MEMORANDUM OPINION

We withdraw our opinion and judgment of June 30, 2025, and substitute the following opinion and corresponding judgment in their place. Appellant's motion for rehearing is denied.

Appellant Moises Galvan appeals his conviction for murder and aggravated assault with a deadly weapon, resulting in concurrent 55-year and 13-year prison terms and two $10,000 fines. He seeks a new trial, asserting jury-charge errors, erroneous exclusion of an expert opinion, and cumulative error. Galvan also seeks dismissal of the charges against him with prejudice based on an alleged violation of his speedy trial right. For the following reasons, we affirm.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

A grand jury indicted Galvan for a shooting that occurred on January 29, 2017, outside an El Paso bar called the Bar Fly, which resulted in bodily injury to David Ortega and the death of Rogelio Franco, Jr. The indictment alleged one count of murder and one count of aggravated assault with a deadly weapon. As discussed in more detail below, Galvan's first jury trial was held in May of 2019 but resulted in a mistrial. His second jury trial was held in September of 2023, resulting in a guilty verdict on both counts.

At his second trial, the jury heard from two eyewitnesses to the shooting—David Ortega, who was shot; and Moises Galvan, the shooter. To unravel their sharply conflicting stories, the jury was presented with video footage from a nearby security camera, DNA evidence from the pistol, and testimony of several non-eyewitnesses.

## A. The State's case

David Ortega testified that he and Rogelio Franco, Jr. were best friends. On the day of the shooting, he met up with Franco around 4:00 p.m. Before going to the Bar Fly, where the shooting occurred, they went to the home of Franco's co-workers and snorted cocaine, spent some time with Franco's family, went to two other bars, then left for the Bar Fly, snorting more cocaine on the way. Video footage showed Franco and Ortega entering the bar at 11:55 p.m.

Ortega testified that when they went to a patio area at the Bar Fly, Galvan approached Franco, stating "You're Sosa" (Franco's Instagram name); "You know who the f--k I am."; "Let's pick in private"; "Come on, let's go talk in private, homey. I'm 19 years old. You're scared." Ortega testified that he had never seen Galvan before. The three then left the bar.

Once outside, Ortega turned to respond to two men who had followed the group out. When Ortega focused back on Galvan and Franco, Franco was facing him. Galvan was between the two. Ortega observed Galvan run toward Franco then saw the flash of a gun discharging. In his

statement to the police the week after the shooting, Ortega estimated that Galvan and Franco were four feet apart when Galvan leaned forward and shot Franco. According to Ortega, there was no fight or struggle. Ortega denied having a gun, and he did not see Franco with a weapon. Ortega ran toward Franco and was shot two times in the chest by Galvan, then once in the hand as he tried to run away. Ortega spent seven days in the hospital and has lost much of the function of his hand.[1]

The State offered the testimony of Nicolas Gomez, a deputy constable with the County of El Paso, who was working off-duty at the Bar Fly the night of the shooting. He was inside an unmarked patrol unit when, around midnight, he heard five or six gunshots. As he went toward where the shots were fired, he saw a person, later identified as Galvan, running away. Gomez saw a dark object in Galvan's right hand, which he believed was a gun. Though Gomez was in full uniform, Galvan refused to stop when ordered to do so. As Gomez pursued Galvan on foot, he no longer saw the dark object in Galvan's hand. Eventually, Galvan fell to the ground. Galvan would not comply with commands to show his hands until Gomez tazed him twice.

After Galvan was handcuffed and secured in a police car, Gomez retraced his steps looking for the dark object. He located a Ruger semi-automatic pistol under a vehicle. The weapon was later confirmed as the one used to shoot both Ortega and Franco. The police recovered five spent shell casings at the scene from the Ruger. One spent casing was still in the chamber and no unfired rounds remained. Gunshot residue was found on Galvan's hand.

The police had the Ruger analyzed for DNA. The swab found the DNA of two persons on the trigger area and handle. When compared to samples of DNA from Galvan, Ortega, and Franco, the DNA evidence was consistent with Galvan but excluded Ortega and Franco. The State's DNA

---

[1] At the time of the shooting, Ortega was on felony probation; his drinking and use of cocaine violated the terms of his probation. At the time of this trial, he was on probation for DUI. He denied making any deal or being promised anything in exchange for his testimony.

analyst conceded it was possible that another person could have handled the gun but left no recoverable DNA on the weapon.

A deputy medical examiner testified that Franco sustained three bullet wounds—one to the neck, one to the chest, and one to the arm—all from front to back. The chest and neck wounds perforated both lungs, resulting in significant internal bleeding and death. One of the wounds showed powder stippling, indicating that the gun was anywhere from six inches to six feet away when fired. A toxicology screen found alcohol, cocaine, metabolites of cocaine, and marijuana in his system. A cell phone found on Franco's person contained a dollar bill and a white powdery substance.

## B. Galvan's version of events

Galvan admitted to shooting Franco and Ortega but claimed he did so in self-defense. His case relied in part on his history with Franco, which he said always ended in violence.

Galvan testified that in 2013, a large group of men, which included Franco, beat and stabbed him. According to Galvan, the group exited a car while Galvan was walking home alone. Franco held Galvan's arms while others in the group beat, punched, and kicked him. Galvan was stabbed in the back with an unknown weapon. His lung was punctured, requiring a one-day hospital stay.[2] Galvan did not call the police. The police went to the hospital to take a statement, but Galvan claimed that he did not identify his assailants out of fear of retaliation against him and his family.

Galvan recalled another incident that occurred at the Tipsy Tiger Bar a few months before the shooting. Galvan testified that a woman who was with Franco began looking at him, which caused Franco to confront Galvan, yelling expletives. Franco's friends held him back and then

---

[2] The hospital record contains a history that Galvan was assaulted by two people at the "Yellow Rose Apartment."

4

ushered him out of the bar. Galvan waited 20 to 30 minutes before trying to leave the bar, along with his cousin, Rudy Galvan, and a friend, "Isaiah," only to find Franco and his friends waiting at the exit. He recalled that Franco yelled at him and threatened to "rip [him] apart," or words to that effect. According to Galvan, someone in Franco's group punched Galvan, knocking him to the ground, and the group then kicked, punched, and broke a beer bottle on him. When the bouncers broke up the fight, Franco and his group fled.

Galvan introduced testimony from Rudy Galvan, who corroborated his story that a fight broke out between Galvan and a group of eight or nine individuals that included Franco, and that one of the individuals—not Franco—punched Galvan during the fight. Galvan also introduced testimony from a friend, Magay Castaneda, who recalled that Galvan and Rudy both came to her apartment later that night for assistance with blood on their clothes, cuts on their faces, and were "pretty beaten up." In addition, Galvan testified that he had previously encountered Franco at a local gym two or three times. According to Galvan, Franco would gesture toward him and point at him, making him feel unsafe. Because of this, Galvan transferred his membership to another gym location.

Galvan testified that on the night of the shooting, he went to the Bar Fly with his then-girlfriend (Roxy), Raymond Solano, and Roxy's brother (Luis Ruiz). They arrived at the bar at 11:30 p.m. Galvan was 19 years old at the time and used Solano's ID to get in once Solano was already in the bar. Galvan testified that he noticed Franco and Ortega in the bar. Cursing, Franco approached him. Galvan tried to leave, when Franco asked, "[W]here are you going bitch? You're not going nowhere." Galvan asked, "Why you sons of bitches always messing with me?" Franco

then flicked a lit cigarette at Galvan's face, causing a burn.[3] Galvan turned to leave the bar, and Franco threw a drink at him.

According to Galvan's testimony, Franco and Ortega followed him out of the bar with Franco still cursing at him. Galvan feared that Franco was there with his usual larger group, but he could not see well because of his "watery" vision, which he attributed to the cigarette burn. They were in a dark area of the strip mall. Galvan testified that he was "terrified, panicking" and "[d]idn't know what to do." Galvan described Franco as six feet tall and 225–250 pounds, while Galvan at the time was 5'7 and 150 pounds. Other evidence revealed that Franco was a body builder.

Galvan testified that while Franco was still taunting him, Ortega started running toward him and pulled a dark object from his pocket, which Galvan told police he hoped was a bb gun, placing it at Galvan's chest. Galvan recalled Ortega saying something to the effect of "It's loaded. It's loaded" and "Let's fuckin' get him." At the same time, Franco was "picking up his pants" and moving toward Galvan with a fighter's stance. Galvan told the jury he thought they were going to kill him, so he wrestled the gun from Ortega. The gun discharged, and Galvan recalled firing once more as Ortega came towards him. After that, "everything kind of just went blank." But he did recall Franco throwing a punch in Galvan's direction. Galvan did not remember how many times he fired the weapon, testifying that: "It happened so fast. Just was blank. I don't remember. I remember -- the last thing I remember was shooting the weapon and running away." Acknowledging he had the weapon at that time, Galvan testified that he did not know if Franco or the others who might have been at the bar with Franco—other than Ortega—were armed. Galvan next recalled running out of fear, and upon tripping, being tased by the sheriff's deputy.

---

[3] When Ortega testified, he denied that Franco flicked a cigarette at Galvan. Galvan introduced a selfie from earlier in the evening that did not show any mark on his face. State's Exhibit 46, taken after the arrest, shows a mark on his right cheek.

### C. Galvan's statement to police and the security video

At trial, the State introduced evidence that after Galvan was arrested, he gave the detectives a video statement later that morning. In the statement, he first claimed he was not involved in the shooting. Galvan told the police he had just dropped off Roxy, Luis, and Ray at the bar, went home, then went back to the bar to pick them up. He told the detective that he tried to get into the bar alone and was turned away by the bouncer but later snuck in. But the bar's security video, which was played for the jury, showed Galvan and Roxy entering together. Galvan also said in his police statement that Franco was already in the bar when he arrived. He said he left with Roxy, but the security video shows him leaving followed by Franco.

After the detective intimated that they had video footage showing what happened, Galvan changed his story and made the self-defense claim. He admitted to knowing Franco and Franco's Instagram account with the "Sosa" name. Galvan told police that a person named "J" (RJ are Franco's first two initials) had earlier tried to rob him of his shoes and had stabbed him. Galvan admitted to the verbal confrontation in the bar and to calling Franco and Ortega "old-ass-niggers." In his statement, Galvan claimed that once outside, Ortega ran up to Galvan with what Galvan hoped was just a BB gun. Galvan tackled him and wrestled the gun from Ortega. At another point in his statement, he told police he ran up behind Ortega and took the gun away, thinking Ortega was playing. Galvan testified at trial that he initially lied to police to keep his girlfriend and Solano out of trouble for their help in using Solano's ID to get into the bar.

### D. The jury's verdict

The jury found Galvan guilty of murder and aggravated assault, and he was sentenced to prison terms of 55 years and 13 years, respectively, to run concurrently. This appeal followed.

7

## II. ISSUES ON APPEAL

Galvan raises six issues for our review. Three issues challenge the jury charge: Issues One and Two raise the question of whether the trial court erred by not including two instructions relevant to the self-defense question, while Issue Five challenges the wording of a transitional instruction for a lesser-included offense question. In Issue Three, Galvan complains of a limitation on his expert witness's testimony. In Issue Four, Galvan contends these alleged cumulative errors undermined the fundamental fairness of the proceeding. Finally, in Issue Six, Galvan maintains the trial court erred by not dismissing the case for failure to afford Galvan a speedy trial. Because the last issue would yield the greatest relief, we address it first.

## III. SPEEDY TRIAL

Galvan urges us to enter a judgment of acquittal because the State violated his right to a speedy trial. Galvan spent six years and over seven months in jail awaiting his second trial that would reach a final verdict. As we discuss in more detail below, numerous events led to this delay, including several unexplained trial date resets; an initial mistrial; delays in obtaining the reporter's record of his first trial; the COVID-19 Pandemic; a series of complaints filed with the State Commission on Judicial Conduct against Judge Marcos Lizarraga, who presided over Galvan's first trial, which led to his recusal; scheduling issues involving the replacement judge; the withdrawal of Galvan's attorneys prior to the second trial; and several unexplained delays in setting his second case for trial. We will examine each of those reasons in our analysis as well as whether Galvan timely asserted his speedy trial right during the periods of delay and whether he was prejudiced by the delays.

### A. Standard of review and controlling law

The Sixth Amendment to the U.S. Constitution, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, guarantees defendants a right to a speedy trial. *See* U.S. Const. amend. VI; *Klopfer v. State of North Carolina*, 386 U.S. 213, 222–26 (1967); *State v. Lopez*, 631 S.W.3d 107, 113 (Tex. Crim. App. 2021). When a defendant claims that his right to a speedy trial has been violated, courts examine four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Lopez*, 631 S.W.3d at 113. Courts must weigh the strength of the *Barker* factors and balance their relative weights considering the State's conduct and the defendant's conduct. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008).

The evidentiary burden differs depending on the *Barker* factor at stake. The State carries the burden to justify the length of the delay. *Id.* at 280. The defendant carries the burden to show the delay is "presumptively prejudicial" and to prove he asserted his right and suffered prejudice. *Lopez*, 631 S.W.3d at 113–14. The defendant's burden of proof on assertion of the right and on prejudice "varies inversely" with the State's degree of culpability for the delay. *Cantu*, 253 S.W.3d at 280 (quoting *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)). "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Id.* at 280–81.

In reviewing the *Barker* factors, we apply a bifurcated standard of review. *Lopez*, 631 S.W.3d at 113–14. We review factual components under an abuse-of-discretion standard and legal components de novo. *Id*. Consequently, we will defer to explicit or implicit findings if they are supported by the record and sustain the trial court's ruling. *Id.* at 114. Engaging in the *Barker* speedy trial analysis on appeal requires us to assess each factor individually yet balance them holistically. *Id*. In the end, we must uphold the trial court's ruling if it finds support in the record

and is correct under any applicable theory of law. *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003).

### B. Analysis

#### (1) The length of the delay

The first *Barker* factor—the length of delay—is a threshold factor. A defendant carries the burden to show that the delay is presumptively prejudicial. *Lopez*, 631 S.W.3d at 113–114. A defendant satisfies that burden by convincing the reviewing court that the delay in the case has crossed the threshold dividing ordinary from presumptively prejudicial delay. *Id.* at 114 (citing *Doggett v. U.S.*, 505 U.S. 647, 651–52 (1992)). Because the length of delay in each case depends on the circumstances of that case, there is no formula to determine what is presumptively prejudicial. *Id*. Even so, there are signposts. A delay approaching one year can trigger the *Barker* speedy trial analysis. *Balderas v. State*, 517 S.W.3d 756, 768 (Tex. Crim. App. 2016). A delay exceeding three-and-a-half years is well beyond the minimum necessary to trigger the analysis. *Id*.

Here, Galvan was arrested on January 29, 2017. As set forth above, his first trial was held over two years later, beginning on May 9, 2019, but resulted in a mistrial. His second trial, which led to his conviction, was not held until over four years later, from September 15 to 23, 2023, a total of six years and over seven months after his arrest. Despite the intervening mistrial that occurred during this period, we count the entire period from arrest to final judgment in calculating the length of the delay.[4] *See State v. Manley*, 220 S.W.3d 116, 122 (Tex. App.—Waco 2007, no pet.) (holding that the "speedy trial clock . . . continues to run until the commencement of a trial

---

[4] We note that some courts have held that when a defendant is being retried following the reversal of a final conviction, the speedy trial clock resets after the reversal, as there has been a final judgment in the interim. *See, e.g.*, *Temple v. State*, No. 14-23-00290-CR, 2025 WL 1799799, at *24 (Tex. App.—Houston [14th Dist.] July 1, 2025), *pet. ref'd*, No. PD-0531-25, 2025 WL 3545841 (Tex. Crim. App. Dec. 11, 2025) (recognizing that "the speedy trial right does not extend beyond conviction") (citing *Betterman v. Montana*, 578 U.S. 437, 441 (2016)). Here, however, Galvan did not suffer a conviction in his first trial, and we therefore conclude that the speedy trial clock continued to run after the mistrial.

which concludes with a verdict or other final disposition" despite an intervening mistrial (citing *Shaw*, 117 S.W.3d at 889 (calculating length of delay from date of indictment to commencement of second trial after first trial had ended with declaration of mistrial))); *see also Mendez v. State*, 212 S.W.3d 382, 385 (Tex. App.—Austin 2006, pet. ref'd) (calculating length of delay from date of arrest to his second trial following an initial mistrial, which led to a final verdict).

We conclude that the six years and over seven months that passed between Galvan's arrest and his second trial, which led to a final verdict and conviction, was sufficient to trigger a complete *Barker* speedy trial analysis. This factor weighs heavily in favor of finding a violation of the speedy trial right. *See Gonzales v. State*, 435 S.W.3d 801, 809 (Tex. Crim. App. 2014) (concluding that a six-year delay "was more than adequate to find presumptive prejudice and trigger a full Barker analysis" and that "this factor—in and of itself—weighs heavily against the State"); *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002) (en banc) (same; nearly four-year delay); *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) (same; three-and-a-half-year delay).

### (2) Reasons for the delay

The second *Barker* factor addresses the reasons for the delay. A "defendant has no duty to bring himself to trial; that is the State's duty." *Zamorano*, 84 S.W.3d at 651. Accordingly, the State bears the burden to justify the length of the delay. *Cantu*, 253 S.W.3d at 280. In assessing the State's justification, "we assign different weights to different reasons." *Balderas*, 517 S.W.3d at 768. A deliberate attempt to delay trial to hamper the defense is weighed heavily against the State. *Barker*, 407 U.S. at 531. More neutral reasons, such as negligence or crowded dockets, are also weighed against the State, but less heavily than deliberate delay. *Id*. Valid reasons for appropriate delay are not weighed against the State at all. *Id*. Delays attributable in whole or in part to the defendant or his attorney are counted against the defendant, and in some instances, may constitute

11

a waiver of the speedy trial claim. *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999) (en banc).

When the record is silent as to the reason for the delay, we may presume neither a valid reason nor a deliberate attempt to prejudice the defense. *Dragoo*, 96 S.W.3d at 314. Therefore, when the record is silent, the second *Barker* factor generally weighs against the State, but not heavily. *Id.*; *Zamorano*, 84 S.W.3d at 649–50 (recognizing that "unexplained" delays may weigh heavily against the State in some instances, but if no evidence is presented that such a delay was *deliberate*, this factor will not weigh heavily against the State).

For ease of discussion, we segment the history of this case into four time periods: (a) from Galvan's arrest to his first trial; (b) from the mistrial of his first trial to the Texas Supreme Court's first COVID-19 order; (c) the COVID-19 Pandemic; (d) post-pandemic until Galvan's second trial.

### (a) The period from arrest to the first trial

A little more than two years and three months passed between Galvan's arrest on January 29, 2017, and his first trial, which began on May 9, 2019. The trial court set the case for trial five times prior during those two-plus years.[5] However, nothing in the record before us explains why these settings were not reached, even though three were specially set. The record contains no motions for continuance or hearing transcripts explaining the delays in reaching the first trial.

The State is accorded a reasonable amount of time to prepare a case for trial. *See State v. Vasquez*, No. 08-16-00089-CR, 2018 WL 4178462, at *6 (Tex. App.—El Paso Aug. 31, 2018, no pet.) (not designated for publication) (finding a six-month delay acceptable for State to prepare for case involving continuous sexual abuse of a child and indecency with a child); *Rivero v. State*,

---

[5] Those settings were for October 12, 2017; April 9, 2018; August 8, 2018; November 26, 2018; and May 2, 2019.

12

No. 08-02-00191-CR, 2004 WL 42625, at \*4 (Tex. App.—El Paso Jan. 8, 2004, no pet.) (not designated for publication) (agreeing the State is entitled to some time, but finding ten months was too long to prepare for a capital murder case and would count against the State, although not heavily). Although the State does not suggest how long was needed to prepare for Galvan's first trial, we will assume for purposes of the appeal that eight months was a sufficient period of time to allow the State to prepare for trial in a murder and aggravated assault case. *See generally Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992) (en banc) (observing, parenthetically, that "courts generally hold that any delay of eight months or longer is presumptively unreasonable and triggers speedy trial analysis").

Discounting the first eight months for trial preparation, given the lack of explanation for not bringing the matter to trial sooner after that time and the numerous unexplained resets of the trial dates, we count the remaining period of delay until the first trial against the State, but not heavily. *See Zamorano*, 84 S.W.3d at 649–50 (where there were multiple unexplained resets of defendant's trial date, the resulting delays were weighed against the State, albeit only slightly); *Dragoo*, 96 S.W.3d at 314 ("In the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay[,]" and this period weighs against the State but not heavily)).

### (b)  The period from mistrial to the COVID-19 Pandemic

Galvan's first trial began on May 9, 2019, and was presided over by Lizarraga. As he did during his second trial, Galvan raised a claim of self-defense, asserting that he had several prior violent encounters with Franco; that he had become involved in an encounter with Franco and Ortega in the parking lot of the Bar Fly during which he wrestled a gun away from Ortega; and that he shot both Ortega and Franco as he was in fear of his life. A pivotal issue at his first trial was whether the gun belonged to Galvan, as the State claimed, or whether he had wrestled it away

13

from Ortega, as Galvan claimed. Galvan repeatedly testified that the gun was not his. During cross-examination, although he acknowledged owning a 12-gauge shotgun and a pellet gun, he confirmed that he told police after his arrest that he had never owned or been in possession of a pistol.

In the midst of the trial, a prospective rebuttal witness for the State, whom we refer to as L.R. and who had been in the parking lot with Galvan at the time of the shooting, informed the court that he was taking the Fifth and would not be testifying at the trial absent a court order. Lizarraga initially ruled that L.R. would not be required to testify and excused him from testifying. The next day, Lizarraga held a hearing outside the presence of the jury to discuss L.R.'s invocation of his Fifth Amendment right, and counsel informed the judge that L.R. was on probation in federal court and that his probation would be revoked if he was in possession of a firearm. It appeared from the discussion that L.R. had provided a statement to police shortly after the shooting indicating that he may have "handled" the gun used in the shooting that night, which arguably could have incriminated him. The State argued at length that L.R. should nevertheless be required to testify, as the State had granted him immunity for his testimony, even though the probation was pending in federal court. The judge did not reach a decision on the issue, but he informed his staff to have L.R., who was in the nearby county jail, ready to testify "in case we need to call him today."

Thereafter, while the State was cross-examining Galvan, one of the prosecutors asked Galvan if L.R. had been with him in the parking lot at the time of the shooting, to which Galvan replied in the affirmative. The prosecutor then asked Galvan if L.R. had said that he (Galvan) "always carries a black Ruger pistol in [his] pocket." Defense counsel immediately objected to the question on hearsay grounds, and the trial court instructed the jury to disregard the question then conducted a hearing outside the presence of the jury.

14

During the hearing, Lizarraga questioned the prosecutor regarding why she believed her question was appropriate, and she responded: "I think it's relevant that he's known to carry a black .380 Ruger." The judge acknowledged as much but noted that this was not the proper way to bring out that information. Defense counsel then moved for a mistrial and argued for a finding that the State had goaded the defense into moving for a mistrial, because it was not prepared to present its case and the mistrial was the result of "prosecutorial misconduct." Lizarraga did not immediately rule on the motion for mistrial. He held the prosecutor "in summary contempt of court" and fined her $100.

Lizarraga issued a written order dated June 3, 2019, which contained findings that the prosecutor's question was improper, that the prosecutor "purposely" asked the improper question, and that the question "permanently prejudiced the jury on a key linchpin fact issue in the case," which "prejudice cannot be overcome." The judge found that "[t]he ulterior motive in this case included an attempt to get [L.R.'s] testimony into evidence . . . 'through the back door' before the trial wrapped up[,]" despite L.R.'s unavailability to testify. However, the judge stated that he would not rule on defense counsel's request to make a finding that the prosecutor engaged in prosecutorial misconduct, as the court did not believe it was relevant to granting the mistrial.

### (i)   We do not count the entire post-mistrial period against the State

As a preliminary matter, we note that although Galvan does not discuss this period with particularity, he contends we should attribute blame to the State for all of the delays after his mistrial, maintaining that the delays were all "due to the State and government actors," including the State's actions in "purposefully seeking to get prejudicial hearsay into evidence 'through the back door,'" which led to the mistrial; filing the complaint with the Commission on Judicial Conduct; and moving to recuse the trial judge two-and-a-half years after the mistrial. Galvan,

however, has cited no authority that would allow us to globally assess blame on the State for all delays after the mistrial based on his view that the State acted in bad faith in provoking the mistrial.

Moreover, as explained in more detail below, though Galvan did not immediately claim that the State was prohibited from prosecuting him a second time due to the mistrial, he later filed a pretrial application for a writ of habeas corpus on double jeopardy grounds in 2023, arguing the prosecutor had acted with specific intent to goad him into seeking a mistrial. He contended that his right to be free from double jeopardy would be violated if he was prosecuted a second time under those circumstances. The trial court denied the application, finding that the prosecutor did not act with the specific intent to goad Galvan into seeking a mistrial. We affirmed the denial, concluding that the court did not abuse its discretion in making that finding. *Ex parte Galvan*, No. 08-22-00096-CR, 2022 WL 16630942, at *5 (Tex. App.—El Paso Nov. 2, 2022, pet. ref'd) (not designated for publication). Accordingly, we find no basis in the record for Galvan's "bad faith" argument or for penalizing the State for all of the delays after the mistrial based solely on the prosecutor's conduct at the first trial. We review each post-mistrial period separately.

### (ii)  Two trial settings were not reached prior to the COVID-19 Pandemic

In assessing the delays that occurred during the post-mistrial period, we keep in mind that the "speedy trial clock" was still ticking during that time. *See Manley*, 220 S.W.3d at 125. In addition, as our sister court has recognized, although the State is allowed a reasonable amount of time to prepare a defendant's case prior to his first trial, there appears to be no authority that would allow the State additional time to prepare for a second trial following an initial mistrial absent special circumstances justifying additional preparation time. *See State v. Echols*, No. 11-19-00209-CR, 2021 WL 2174148, at *4 (Tex. App.—Eastland May 28, 2021, pet. ref'd) (mem. op., not designated for publication) (concluding that the trial court could have reasonably determined that the State did not need additional time to prepare for a second trial where it failed to "provide

16

circumstances demonstrating the need for such additional time") (citing *Shaw*, 117 S.W.3d at 889–90 (noting that the State was permitted a "reasonable period in which to prepare its case" prior to a first trial but not discussing preparing time necessary to prepare for a second trial)). Here, the State has not asserted any such special circumstances.

The record before us reflects that following the mistrial, Galvan's case was set for trial on August 6, 2019, three months after the mistrial. Because the State has not explained why the case could not have been tried earlier, we weigh this almost three-month period between the May 2019 mistrial and the August 2019 setting against the State, albeit slightly.

The August trial setting was not reached, as Galvan's attorney filed a motion for continuance on June 26, 2019, stating he had requested a copy of the reporter's record of Galvan's first trial, and the court reporter had informed him on June 21, 2019, that she was unable to produce the record prior to the setting.[6] The record does not contain an order granting the motion, but it does contain a new trial setting for January 28, 2020.

Nothing in the clerk's record indicates why the case did not go to trial on the January 2020 date. There are no other trial settings in Galvan's case until July of 2021, which, as set forth below, was well into the COVID-19 Pandemic period. However, during a speedy trial hearing that took place in 2023, the State's prosecutor asserted that the matter did not go to trial in January because the record was still not ready. According to the prosecutor, the "transcripts were not prepared or final until June 3rd of 2020," based on the reporter's signature on those records. At the hearing, Galvan's attorney did not dispute the timing of when the record was finalized, but he pointed out that a court reporter has a statutory duty to produce a transcript within 120 days as contemplated by the Texas Government Code. Tex. Gov't Code Ann. § 52.047(a)(1)(2) (upon request and

---

[6] Counsel attached the letter from the court reporter stating that: "I want to inform the parties that the Moises Galvan record will not be ready by the next trial setting of August 8. It is roughly 2500 pages long. I informed the judge of this and he said it is up to the party that needs the record for the trial to properly seek a continuance."

payment of a required fee, the "official court reporter shall furnish the transcript to the person not later than the 120th day" after the request and payment (if required) have been made). Galvan sought to blame any delays beyond that time period on the State, asserting the court reporter was part of the "State's apparatus" that has a duty to ensure a defendant is timely brought to trial.

We do not dispute the contention that undue or unexplained delays by a court reporter in preparing a necessary record could be attributed to the State. *See Aguirre v. State*, No. 08-20-00057-CR, 2022 WL 3225160, at *3 (Tex. App.—El Paso Aug. 10, 2022, pet. ref'd) (not designated for publication) (delay in the State's ability to go to trial on date set due to court reporter's unavailability weighed against the State, albeit only slightly, as the delay was "attributed to the nature of the court's docket" (citing *Shaw*, 117 S.W.3d at 890) ("[a] crowded court docket is *not* a valid reason for delay and must be counted against the State, although *not* heavily" (emphasis added))); *see generally Gonzales*, 435 S.W.3d at 809–10 (quoting *Barker*, 407 U.S. at 531) (recognizing that although deliberate delays weigh heavily against the State, "[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant"). However, Galvan requested the initial continuance until the record could be prepared, and there is nothing in the record to suggest that Galvan sought the trial court's intervention to expedite the record.

Accordingly, we assign the first four months after Galvan moved for continuance against him, he chose to delay the trial setting in order to receive the record. *See State v. Uhl*, 717 S.W.3d 117, 133 (Tex. App.—Austin 2025, pet. ref'd) (recognizing that a defense motion for a continuance weighs against the defendant) (citing *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017); *Shaw*, 117 S.W.3d at 889)); *Rivero*, 2004 WL 42625, at *5 (recognizing same). But we conclude that the remaining three-month delay between then and the Supreme Court's initial

COVID-19 order in March of 2020 is partially attributable to the State, for the delays in the preparation of the reporter's record, and to Galvan, for not taking steps to try to expedite the process. We therefore assign that three-month period a neutral weight. *See Hopper*, 520 S.W.3d at 928 (where both parties were "equally blameworthy for a period of delay, the reasons-for-delay factor is essentially neutral").

### (c) The COVID-19 Pandemic

Next, the COVID-19 Pandemic interrupted court functions starting in March of 2020, after the Texas Supreme Court issued its first COVID-19 Order on March 13, 2020. *First Emergency Order Regarding COVID-19 State of Disaster*, 596 S.W.3d 265 (Tex. 2020). The order provided: "Subject only to constitutional limitations, all courts in Texas may in any case, civil or criminal— and must to avoid risk to court staff, parties, attorneys, jurors, and the public—without a participant's consent . . . Modify or suspend any and all deadlines and procedures, whether prescribed by statute, rule, or order, for a stated period ending no later than 30 days after the Governor's state of disaster has been lifted." *Id*. Although the court issued various orders thereafter, which would have let courts begin to slowly reopen upon submitting a plan for approval by the State Office of Court Administration beginning as early as June of 2021, the latest date by which courts were required to reopen was October 1, 2021.[7] *See Fortieth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 911, 912 (Tex. 2021) (providing that "[s]ubject only to constitutional limitations, all courts in Texas may in any case, civil or criminal, without a participant's consent . . . modify or suspend any and all deadlines and procedures,

---

[7] *See Seventeenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 119 (Tex. 2020) (authorizing the resumption of in-person proceedings on June 1, 2020, subject to the adoption of an operating plan in compliance with the Office of Court Administration's (OCA) guidelines for social distancing, maximum group size, and other restrictions and precautions).

whether prescribed by statute, rule, or order, for a stated period ending no later than October 1, 2021").

Surprisingly few cases address how a court should treat the pandemic period for speedy trial purposes. The authority appears to be split among those few cases, with some courts concluding that the delays caused by the Pandemic do not weigh against the State and are assigned a neutral factor, and others concluding that if they do weigh against the State, they weigh only slightly against it. *See, e.g.*, *Martinez v. State*, Nos. 01-22-00390-CR, 01-22-00391-CR, 2024 WL 2751393, at *21 (Tex. App.—Houston [1st Dist.] May 30, 2024, pet. ref'd) (mem. op., not designated for publication) (recognizing that intermediate courts of appeals in Texas "have not reached a uniform conclusion concerning whether delays caused by the pandemic should weigh against the State or be neutral, but courts reasoning that the delay should weigh against the State have concluded that this delay should not weigh heavily" (citing *Laird v. State*, 691 S.W.3d 30, 40 (Tex. App.—Austin 2023, pet. ref'd) (referring to the period from March 2020 to October 2022, during which jury trials were suspended in Comal County, the court held that "[t]o the extent that the pandemic and related court closures weigh against the State, they do so but slightly."")); *State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.) ("Delay caused by the onset of a pandemic cannot be attributed as fault to the State."); *see also Ragsdale v. State*, 713 S.W.3d 435, 449 n.6 (Tex. App.—Houston [1st Dist.] 2025, no pet.) (recognizing that "[a]ppellate courts have not reached a uniform conclusion over whether COVID-19 related delays weigh against the State, but courts reasoning that a COVID-19 delay weighs against the State have also concluded that it does not weigh heavily"); *Ex parte Lively*, No. 03-24-00015-CR, 2025 WL 3114025, at *13 (Tex. App.—Austin Nov. 7, 2025, pet. ref'd) ("The delay associated with the COVID-19 Pandemic can fairly be attributed to the State, but only slightly.") (citing *Uhl*, 717 S.W.3d at 133 (concluding same)).

Some courts have found it appropriate to divide the pandemic period into its early stages and its later stages. These courts recognize that although the State may not be to blame for delays during the early stage of the pandemic, a different standard applies during the later stages when courts were allowed to conduct trials under certain guidelines. *See Huynh v. State,* No. 05-21-00991-CR, 2022 WL 17261155, at *5 (Tex. App.—Dallas Nov. 29, 2022, pet. ref'd) (mem. op., not designated for publication) (citing various orders from the Texas Supreme Court setting forth options for holding trials during the COVID-19 Pandemic and recognizing that "notwithstanding the pandemic, the State's ability to hold a trial, while perhaps limited at various times and in various ways, was present during a substantial portion of the periods of delay in this case post the onset of the pandemic"). As such, in *Huynh,* the court found it appropriate to consider the delays in the later stages of the pandemic against the State, albeit only slightly. *Id.* at *6. As our sister courts have noted, "a state of disaster alone cannot indefinitely pretermit the speedy trial right," and thus, "even in a pandemic, the Constitution cannot be put away and forgotten." *Id.* at *5 (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020)); *see also Lovelace v. State*, 654 S.W.3d 42, 49 (Tex. App.—Amarillo 2022, no pet.); *Roman Catholic Diocese*, 592 U.S. at 23 (Gorsuch, J. concurring) ("Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical).

To that end, although the Texas Supreme Court set an October 1, 2021 deadline for reopening the courts, the court slowly allowed trial courts to reopen under restricted guidelines as early as June 1, 2020. *See Seventeenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 119 (Tex. 2020) (authorizing the resumption of in-person proceedings on June 1, 2020, subject to the adoption of an operating plan in compliance with the Office of Court Administration's guidelines for social distancing, maximum group size, and other restrictions and precautions); *see also Huynh*, 2022 WL 17261155, at *6 (recognizing that Collin County had an

approved plan in effect by July 1, 2020, permitting "essential court matters" to proceed with jury trials, including where a defendant has requested a speedy trial or speedy disposition); *Lovelace,* 654 S.W.3d at 49 (recognizing that, in accordance with the Texas Supreme Court's Thirty-Third COVID-19 Order, which was issued on January 14, 2021, courts were able to conduct in-person trials after that time, assuming they complied with the Office of Court Administration's directives.

Here, nothing in the record indicates when, or if, El Paso County adopted any such guidelines, or when El Paso County district courts began holding jury trials in criminal cases. The question then arises regarding when the State could have first prosecuted Galvan after the Texas Supreme Court's first COVID-19 order was issued in March of 2020. At a hearing in January of 2022, Lizarraga made an anecdotal statement to the effect that he was not aware of any murder trials being held in the courthouse after the March 2020 order was issued. However, the State did not provide any support for that statement.

The record does contain two notices of court settings, which we find helpful in determining when the State could have at least attempted to obtain a trial setting in Galvan's case. The first notice set an in-person scheduling conference for July 26, 2021, and a second notice, which was dated July 22, 2021, continued the conference until October 18, 2021, noting that El Paso County was "bracing itself for a surge of COVID-Delta *(strain)* infections, and that local government officials [were] urging caution in scheduling public hearings." The notice referenced the Texas Supreme Court's order setting October 1, 2021, as the last date on which courts could modify or suspend deadlines and procedures due to the pandemic. Accordingly, we conclude that the one-year and six-and-a-half-month period from March 19, 2020, to October 1, 2021, constitutes the relevant period of time during which the State would have been unable to obtain a trial date to prosecute Galvan's case. Given the nature of the court's closure, which was out of the parties' control, we assign this period of delay a neutral weight.

22

### (d)   The post-pandemic period until Galvan's second trial

Although we calculate the pandemic period as ending on October 1, 2021, the pandemic period was not without activity in Galvan's case, and those activities ultimately resulted in delays between the October deadline and the time his trial was finally held almost two years later in September of 2023. It does not appear that the trial court issued any trial settings in the interim. There are numerous reasons for this delay, some of which the State justifies, and some of which it does not. We break these into five categories.

### (i)   October of 2021 through January of 2022

By way of background, we note that sometime prior to August of 2021, the State Commission on Judicial Conduct began investigating Lizarraga for his conduct in the *Galvan* case. The Commission asked the judge to respond to multiple complaints, including allegations of bias against the State and of holding an improper in-chambers "hearing" with defense counsel. The Commission's Notice states that Lizarraga wrote a letter to then-DA Yvonne Rosales on August 18, 2021, "alleging a felony he claimed was committed in his presence or within his knowledge during the trial of the Galvan Case more than 2 years before." It further indicates that he did so without notifying law enforcement about the alleged offense. It asserts that an assistant district attorney involved in Galvan's prosecution filed an additional complaint against Lizarraga in August of 2021 for his conduct both during and after Galvan's 2019 trial. The Notice indicates Lizarraga appeared before the Commission on October 27, 2021.

Related to these complaints, at least one of Galvan's attorneys sought to withdraw from representing Galvan on September 8, 2021, citing a conflict of interest, believing he had become "a fact witness to allegations regarding misconduct in the instant case." Shortly thereafter, on December 10, 2021, his co-counsel also sought to withdraw, citing an unspecified conflict of interest. Although it appears that the trial court set a hearing on the motion to withdraw as well as

23

a status hearing on December 15, 2021, it does not appear that any such hearing was held or that the judge ruled on either of those motions.[8]

Accordingly, despite the Commission's ongoing investigation, and defense counsel's unsuccessful attempts to withdraw, the State was still free to prosecute Galvan once the courts reopened in October of 2021. We recognize that there may have been obstacles to securing a jury trial during the early stages of the post-pandemic period that could have left the State blameless in not prosecuting Galvan during that time. *See State v. Gabaldon*, 727 S.W.3d 1, 11 (Tex. Crim. App. 2025) (finding the State "blameless" for delays that occurred in the latter stages of the Pandemic, where "the only continuance ever issued by the trial court was when it reset the trial date of November 5 to December 2 [2021] because a jury panel was not available amidst the COVID-19 Pandemic"). However, there is nothing in the record to reflect that the State made any effort to obtain a trial setting in Galvan's case, and it has provided no justification for its failure to do so—at least until certain events described below occurred in late January of 2022. We therefore assign this initial four-month period of unexplained delay against the State, albeit only slightly. *See Gonzales*, 435 S.W.3d at 810 (recognizing that unexplained delays weigh slightly against the State).

### (ii) The January 2022 "emergency hearing" and Lizarraga's recusal

It appears that the first hearing Lizarraga held in Galvan's case following the pandemic was a January 11, 2022 "emergency hearing" which Galvan and all counsel attended. At the hearing, Lizarraga acknowledged receiving an ex parte letter from Galvan in December of 2021, complaining about the "delays in the trial." Lizarraga acknowledged that both Galvan and other "parties" had expressed frustration over the delays. However, he explained to Galvan that his

---

[8] The record also contains a notice of a scheduling conference set for July 26, 2021, and a reset to October 18, 2021, pursuant to the Supreme Court's 40th pandemic order, However, nothing in the record indicates that the October 18, 2021 conference was held.

attorneys were not responsible for the delays, and—apparently referring to the COVID-19 Pandemic—he stated, "I am almost sure that there has not been a jury murder trial case in the courthouse since March of 2020."

Lizarraga stated that he intended to set Galvan's case for trial, but he wanted to discuss the prospect that Galvan could claim that double jeopardy prevented a retrial because of the mistrial. Lizarraga indicated that he had already appointed an attorney to represent Galvan to bring a habeas petition to that effect. Lizarraga said he "anticipate[d] that at the appropriate time and before a new jury is assembled," Galvan's appointed attorney would raise the double jeopardy claim.

At the hearing, Lizarraga also announced that the State Commission on Judicial Conduct had initiated a complaint against him based on his conduct in this case. He expressed his belief that the Commission had "secretly" contacted the State's prosecutors in an "ex parte" manner, without notifying defense counsel or the court.[9] The judge explained that the complaint could cause Galvan to "improperly lose his first judge" in the case; that he did not intend to wait until Galvan's attorneys or the State's prosecutors tried "to figure out if they need[ed] to take legal steps because of this to protect their client's interest"; and that he intended to appoint an attorney to "protect the best interest" of the court in the Galvan matter, at his own expense. However, he rescinded that order on January 24th.

Lizarraga also stated that a December 30, 2021 incident had been reported to him which made him believe Galvan's "rights [were] being violated in a way that could help . . . Galvan walk out of jail without a retrial of this case," and that he had already discussed the matter with the

---

[9] The Judicial Conduct Commission's formal charging document, which the State later attached as an exhibit to its motion to recuse Judge Lizarraga, contained four charges: "Bias Against the State"; "Improper Relationship with and Bias Towards the Defense"; "Improper In-Chambers Hearing"; and "Failure to Cooperate with the Commission's Investigation." On April 11, 2025, the Commission issued a Public Admonishment to Judge Lizarraga related only to *ex parte* communications that he had during the trial with the defense and the prosecution. *See* Public Admonition of Hon. Marcos Lizarraga, 88 Tex. B.J. 469 (June 2025) (Tex. Comm'n on Jud. Conduct).

25

lawyers. He added that he did not make this suggestion because he wanted Galvan to "win," but because of the "need to maintain order in my court and to make sure that proper predictable procedures that are contained in the Texas Code of Criminal Procedure are followed."

On February 22, 2022, the State moved to recuse Lizarraga based on the alleged bias in Galvan's favor, generally tracking the Commission's charges, which were public at that point. The State recited that the Commission alleged in its Notice that the judge had accused one of the assistant district attorneys of "witness tampering" in Galvan's case, and that the judge had appointed an attorney "to prepare a pre-trial application [on Galvan's behalf] for writ of habeas corpus based on prosecutorial misconduct."

After Lizarraga declined to voluntarily recuse himself, the Honorable Sid Harle, sitting by assignment, held a hearing and granted the recusal motion on March 31, 2022, reasoning that the trial judge reported "potential criminal conduct that allegedly occurred during the [first] trial of the underlying case," making himself a witness in the pending retrial of the case. On April 4, 2022, the Honorable Stephen Ables, Presiding Judge for the Sixth Administrative Region, was appointed to handle the case.

Galvan contends that any delays relating to Lizarraga's recusal, and the consequent need to appoint a visiting judge, were due to both the judiciary—in light of the charges against Lizarraga—and the district attorney's office—in light of its choice to pursue the recusal motion.[10] We recognize that both the prosecution and the judiciary "are under a positive duty to prevent unreasonable delay[,]" and they both shoulder the "primary burden . . . to [e]nsure that defendants are speedily brought to trial." *Chapman v. Evans*, 744 S.W.2d 133, 136–37 (Tex. Crim. App. 1988)

---

[10] In addition, Galvan faults the State for not seeking to recuse Lizarraga sooner, asserting that the State waited over two years to move to recuse him. As set forth above, however, the State's recusal motion was based almost exclusively on the Commission's allegations, which were not publicly announced until December 29, 2021. The State only waited two months after this announcement before it filed its motion. We do not find this to be an unreasonable period of delay.

26

(en banc); *see also Wrighter v. State*, No. 08-99-00109-CR, 2003 WL 318527, at *1 (Tex. App.—El Paso Feb. 13, 2003, pet. ref'd) (not designated for publication) (recognizing same). However, the Commission's Notice to Lizarraga alleged that he held an improper in-chambers "hearing" with Galvan's defense counsel, and in its Public Admonishment, the Commission found that Lizarraga had engaged in ex parte communications with both defense counsel and the prosecutors in Galvan's case. *See* Public Admonition of Hon. Marcos Lizarraga, 88 Tex. B.J. 469 (June 2025) (Tex. Comm'n on Jud. Conduct). We therefore conclude that because both the State and Galvan's defense counsel were determined to be involved in the conduct that led to Lizarraga's recusal, we weigh this two-month period of delay as neutral. *See Hopper*, 520 S.W.3d at 928 (assigning a neutral value to a delay where both parties were "equally blameworthy").

### (iii) The withdrawal of defense counsel

As explained below, Galvan's habeas attorney filed a pretrial application for a writ of habeas corpus on double jeopardy grounds on January 27, 2022. After the trial court denied his application and it was pending on appeal, one of Galvan's trial attorneys filed his second motion to withdraw from representing Galvan on June 30, 2022, averring that Galvan told him that he no longer wanted his representation. Shortly thereafter, another of Galvan's appointed attorneys filed a motion to withdraw on July 5, 2022, citing an unspecified conflict of interest with Galvan. On July 11, 2022, and August 19, 2022, respectively, the trial court granted the motions. Galvan's new trial attorney[11] was appointed on September 8, 2022.

While Galvan lacked trial counsel, the State would not have been able to bring Galvan's case to trial. We therefore assign the two-month period from July of 2022 to September of 2022

---

[11] While realistically, Galvan's new counsel would have needed time to prepare for trial, we do not count this time against Galvan, as it is the State's duty to bring defendants to trial, and the State in this case did not attempt to do so again until well into Galvan's new attorney's tenure. The analysis would be different had the State pushed forward to trial and Galvan requested a continuance. Acquiescence, as discussed below, is a separate inquiry.

27

against Galvan. *See Munoz*, 991 S.W.2d at 822 (recognizing that delays caused by or attributable to the defendant or defendant's trial counsel generally weigh against the defendant).

### (iv) Galvan's pretrial habeas petition

In the meantime, on January 27, 2022, Galvan's habeas attorney filed an Application for Writ of Habeas Corpus based on his claim that he was entitled to an acquittal on double jeopardy grounds due to the May 2019 mistrial. After seeking an extension of time to respond, the State filed its response almost five months later, on May 10, 2022. A month later, on June 6, 2022, Ables heard and denied Galvan's double jeopardy writ application.[12] In his written order, Ables reasoned that the original order granting the mistrial made no mention that the mistrial constituted double jeopardy. Additionally, Ables found that the objectionable question asked by the prosecutor was never answered by the witness and an "instruction to the jury to disregard the question was sufficient to cure any harm."

On June 7, 2022, Galvan appealed Ables's ruling to this Court. On August 1, 2022, Galvan moved the trial court to stay all trial court proceedings pending a final decision on the appeal. The State opposed the motion, filing a letter with the trial court stating that it believed the court lacked the authority to act on the motion. According to the State's letter, because "there has been no setting for trial, Galvan's motion is premature, and this Court need not rule on that motion at this time." The State also argued that a stay of the proceedings would be inappropriate because "(1) his appeal is devoid of merit for the reasons stated at the writ hearing, which will be further expounded on in the State's brief on appeal; and (2) the El Paso (8th) Court of Appeals has specifically held that an interlocutory appeal, such as Galvan's, should not stay trial-court

---

[12] Galvan separately brought applications seeking a writ of habeas corpus based on excessive bail, one of which was appealed to this Court. *Ex parte Galvan*, No. 08-22-00229-CR, 2023 WL 2541358 (Tex. App.—El Paso Mar. 16, 2023, pet. ref'd) (not designated for publication). Because the parties do not argue that these applications impacted the timeline of events, we do not consider them in our analysis.

28

proceedings," citing *In re State*, 50 S.W.3d 100, 102–04 (Tex. App.—El Paso 2001, no pet.).[13] It does not appear that the trial court ruled on Galvan's motion to stay, and nothing in the appellate record indicates that Galvan filed a motion seeking a stay in this Court.

On November 2, 2022, we denied Galvan's appeal in his habeas proceeding. *Ex parte Galvan*, No. 08-22-00096-CR, 2022 WL 16630942 (Tex. App.—El Paso Nov. 2, 2022, pet. ref'd) (not designated for publication). As stated in our opinion, the relevant standard under the double jeopardy analysis required Galvan to "show the prosecution engaged in conduct intended to provoke the defendant into moving for a mistrial." *Id*. at *4. We concluded that Galvan failed to meet that burden, as he did not brief how the record met a six-factor test applicable to this core question. *Id.* at *5. We independently reviewed the record under the test and concluded it supported the trial court's finding that the State did not intentionally engineer a mistrial. *Id*. at *5–6. Galvan filed a petition for discretionary review with the Texas Court of Criminal Appeals, which was finally rejected on January 25, 2023. Our mandate issued on February 24, 2023.

The State contends we should attribute that entire period of delay against Galvan. We disagree. Although filing his habeas application may reflect on the third and fourth *Barker* factors concerning whether Galvan acquiesced in the delay during this time or whether he truly wanted a speedy trial, this does not resolve the question of who was responsible for this period of delay.

Although Galvan requested a stay of the trial court proceedings while the trial court's order denying his application was pending on appeal, neither the trial court nor this Court ever entered a stay order. As explained below, there is no automatic stay of the trial court proceedings when a

---

[13] In that case, we held that "In the civil context . . . a trial court retains jurisdiction of a case during an interlocutory appeal and may even proceed to trial on the merits of that case during such appeal." *In re State*, 50 S.W.3d 100, 103 (Tex. App.—El Paso 2001, no pet.). Although we recognized that there "is no analogous rule governing interlocutory criminal appeals, there is the general principle that an appeal from a preliminary order does not suspend the trial court's power to proceed on the merits" (internal quotation marks omitted). *Id*. We therefore concluded that the State's appeal from a pretrial order "does not suspend the trial court's power to proceed on the merits."

defendant files a pretrial application for a writ of habeas corpus, and in the absence of a stay order, the State was free to prosecute Galvan. Here, nothing in the record suggests the State attempted to do so during this period.

As the Court of Criminal Appeals has recognized, a pretrial habeas proceeding is a "separate proceeding from a criminal prosecution." *Ex parte Sheffield*, 685 S.W.3d 86, 100 (Tex. Crim. App. 2023). A "habeas appeal has no effect on the underlying criminal prosecution." *Id.* at 99. Accordingly, "[a] pending appeal in a habeas proceeding does not by itself bar a trial court from going forward on the underlying criminal prosecution; the appeal only bars the trial court from acting on the habeas proceeding." *Id.* "If a defendant wishes to prevent the trial court from proceeding to trial during pending pretrial habeas litigation, the defendant should seek a stay." *Id.* When a defendant does not obtain a stay of the criminal prosecution while his habeas appeal is pending, the trial court has jurisdiction to proceed to trial. *Id.*; *see also Lopez v. State*, Nos. 03-23-00380-CR, 03-23-00381-CR, 2025 WL 1646096, at *2–3 (Tex. App.—Austin June 11, 2025, no pet.) (mem. op., not designated for publication) (relying on *Sheffield* for the proposition that a trial court has the authority to proceed to trial during the pendency of the defendant's habeas appeal); *In re State*, 50 S.W.3d at 103 (concluding that a defendant's interlocutory pretrial appeal did not "suspend the trial court's power to proceed on the merits").

In the context of a habeas application raising double jeopardy grounds, our sister courts have recognized that when the defendant appeals from a denial of such an application, both the trial court and the court of appeals have the discretion to deny a stay request pending appeal if it determines the application is frivolous. *Williams v. White*, 856 S.W.2d 847, 848 (Tex. App.—Fort Worth 1993, no writ) (citing *United States v. Dunbar*, 611 F.2d 985, 989 (5th Cir. 1980); *Trimboli v. Hon. John MacLean*, 735 S.W.2d 953, 954 (Tex. App.—Fort Worth 1987, orig. proceeding)). This safeguard is in place to ensure that the appeal from the habeas application is not "being

30

frivolously filed just as a tactic for delay." *Trimboli*, 735 S.W.2d at 954 (recognizing that "in cases where the movant has appealed the trial court's denial of his double jeopardy claim, the movant is entitled to a stay of further proceedings unless the trial court has determined that the double jeopardy claim is frivolous and the appellate court is in agreement, after a review of the record before it, that the double jeopardy claim is frivolous").

Here, the State argued against Galvan's request for a stay order in part on the ground that Galvan's appeal was "devoid of merit," impliedly indicating a desire to go forward with a trial during that period. Yet nothing in the record shows that the State made any effort to go forward with prosecuting Galvan during this time, and there are no trial settings in the record during this period. Accordingly, we weigh this period of delay against the State that we have not already accounted for, albeit slightly, given its unexplained failure to seek prosecution while Galvan's habeas case was winding its way through the court system.[14] *Zamorano*, 84 S.W.3d at 649–51 (weighing unexplained delays against the State).

### (v.) Post-habeas proceedings and eventual trial setting

Following our mandate, Ables held a status conference on April 20, 2023, with the intent of setting a trial date. At the hearing, the parties informed the court that although a bond issue was still pending in the court of appeals, it had no effect on setting a trial date. The prosecutor stated that he had just been assigned the case and that he had not yet looked at the "27 boxes" of documents in his office, but he pledged to be ready upon the setting of a trial date. Ables informed the parties that his calendar was full until the following January. Defense counsel stated that his

---

[14] In its brief, the State relies upon *United States v. Loud Hawk*, 474 U.S. 302, 316 (1986) for the proposition that delays occasioned by a defendant's filing of a frivolous interlocutory appeal from the trial court's pretrial order denying his motion to dismiss the indictment against him weighed against his claim that his speedy trial rights were violated. As explained above, however, Galvan did not file an interlocutory appeal from a pretrial order in his criminal case, and instead filed an appeal in a separate habeas proceeding. Because the State was free to prosecute him during that time, we cannot count that time against Galvan.

31

"client is interested in a quicker date than that if possible in light of the fact that he has been held in custody without conviction for I think five years now approximately." He then stated: "So, I mean, obviously, I think we need to -- we need to respect your calendar and the like, but if you can give us a date sooner than that I do think my client will be requesting that." The prosecutor agreed, stating he was "also a little concerned at the age of this case." The court concluded the hearing after informing the parties that he would get back to them with some dates. The case was reassigned to the Hon. Dick Alcala that same day (April 20, 2023).

Beginning on June 22, 2023, Galvan's attorney began filing documents preparing for trial, referencing a September 2023 trial setting (although none appears in the record at that time), including a motion for a bench warrant for Galvan's appearance at trial, a motion for discovery, and a motion to exclude the State's expert witnesses. Shortly thereafter, on July 24, 2023, Galvan filed a written "MOTION FOR SPEEDY TRIAL AND FOR DISMISSAL FOR FAILURE TO AFFORD THE ACCUSED A SPEEDY TRIAL." In his motion, he stated that Galvan had "previously requested a speedy trial in writing (Exhibit 1) and he continues to demand a speedy trial." Galvan further requested "a hearing in advance of trial to show that his Constitutional rights to a speedy trial have been violated and for dismissal of the case." On July 26, 2023, Galvan's counsel moved the trial court to appoint co-counsel to assist at trial.

The trial court granted Galvan's motion for the appointment of co-counsel on July 27, 2023. That same day, Alcala set trial for September 2023. Treating Galvan's motion as a motion to dismiss, Alcala heard and overruled it on August 24, 2023. As set forth above, Galvan's trial was held from September 15 to 23, 2023,[15] and he was found guilty on both counts as alleged in the indictment.

---

[15] Voir dire was held on September 15th and the trial began on September 18th.

Although we issued our mandate in Galvan's habeas appeal on February 24, 2023, Galvan's second trial was not held until almost seven months later. This delay appears to have been first occasioned by the trial court's inability to hold a trial quickly and the need to reassign the case on April 20, 2023. There is no explanation for why it took an additional five months to try the case after Alcala, the new judge, was appointed.[16] We therefore weigh this entire almost seven-month period of unexplained delay from the time that our mandate issued in February of 2023 until the jury reached its verdict in September of 2023 against the State, albeit slightly. *See Zamorano*, 84 S.W.3d at 649–51; *see also Shaw*, 117 S.W.3d at 890 (recognizing that "a crowded court docket is not a valid reason for delay and must be counted against the State, although not heavily").

### (e) Summary of apportionment of the delays

In sum, though we do not find that either party deliberately delayed the trial, we assign the following periods of delay over the course of the six years and over seven months that Galvan awaited trial as follows.

We weigh the following periods of delay against the State, albeit only slightly:

- The unexplained period of one year and over seven months' delay from Galvan's arrest in January of 2017 to his first trial in May of 2019 (removing an eight-month period for trial preparation);

- The three-month period of unexplained delay from the time of the mistrial in May of 2019 until the trial was first reset for August of 2019.

- The net nine-month period of delay from October 1, 2021 when the Texas Supreme Court directed courts to reopen until February 24, 2023 when our mandate issued in the habeas appeal, (deducting the two months during which Galvan was without counsel due to his attorneys' request to withdraw, the two-month period when the State's recusal motion was pending); and

---

[16] We recognize that there may be practical difficulties with bringing a case to trial when there is a newly assigned judge; however, the State is nevertheless responsible for acquiescing in any delays resulting from the fact that a newly assigned judge or prosecutor may be unfamiliar with a case. *Balderas*, 517 S.W.3d at 771 (concluding that "the State acquiesced in a delay . . . because the newly assigned judge and prosecutor were unfamiliar with the case").

- The unexplained almost seven-month delay from the issuance of our mandate in the habeas appeal in February of 2023 to the time of the final trial in September of 2023.

We weigh the following periods of delay against Galvan, albeit only slightly:

- The initial four-month delay caused by Galvan's request for the reporter's record following his mistrial, and his request for a continuance of his August 2019 trial setting; and

- The two-month period of delay caused by the withdrawal of Galvan's attorneys in July and August of 2022.

We find the following periods of delay cannot be assigned to either party:

- The eight-month period in which the State was preparing for Galvan's first trial;

- The three-month period in which the court reporter failed to timely provide Galvan with the reporter's record;

- The one-year and six-and-a-half-month delay caused by the initial period of the COVID-19 Pandemic from March 13, 2020 to October 1, 2021; and

- The two-month period when the State's recusal motion was pending.

Thus, the total period of delay that we weigh against the State is three years and six months, while we weigh six months against Galvan, and we weigh the remaining two years and over seven months neutrally. On balance, this factor weighs against the State, albeit only slightly. *Shaw*, 117 S.W.3d at 890 (weighing factor in favor of finding a violation of appellant's speedy trial right where the State did not justify most of the lengthy delay in the case) (citing *Dragoo,* 96 S.W.3d at 314).

### (3) Galvan's assertion of right to speedy trial

The third *Barker* factor focuses on whether the defendant timely asserted his right to a speedy trial. *Balderas*, 517 S.W.3d at 771. Galvan carries the burden to prove he timely asserted his right. *Id.* That assertion "should be, at the very least, unambiguous." *Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013). A defendant's assertion of his right to a speedy trial is entitled to strong evidentiary weight in determining whether the defendant was deprived of that

right. *Barker*, 407 U.S. at 531–32. On the other hand, a "defendant's lack of a timely demand for a speedy trial indicates strongly that he did not really want one." *Balderas*, 617 S.W.3d at 771. "The longer the delay becomes, the more likely a defendant who wished a speedy trial would be to take some action to obtain it." *Id.* (internal quotation marks omitted); *see also Dragoo*, 96 S.W.3d at 314 (recognizing that a defendant's failure to timely demand a speedy trial "strongly indicates that he did not really want a speedy trial and that he was not prejudiced by the lack of one). This factor acknowledges "the reality that defendants may have incentives to employ delay as a 'defense tactic': delay may 'work to the accused's advantage' because 'witnesses may become unavailable, or their memories may fade' over time." *Vermont v. Brillon*, 556 U.S. 81, 90 (2009) (quoting *Barker*, 407 U.S. at 521). "Thus, inaction weighs more heavily against a violation the longer the delay becomes." *Balderas*, 517 S.W.3d at 771 (internal quotation marks omitted).

Significantly, "[t]he constitutional right is that of a speedy trial, not dismissal of the charges." *Cantu*, 253 S.W.3d at 281. Thus, in general, when a defendant seeks dismissal of his case based on speedy trial grounds rather than requesting a speedy trial itself, this "will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one." *Id.* at 283. *Cantu*, 253 S.W.3d at 283. However, the Court of Criminal Appeals has recognized that "in some cases, defense counsel may legitimately feel that a long delay has caused a client so much prejudice that dismissal is warranted, even if the State is belatedly ready to move promptly." *Lopez*, 631 S.W.3d at 116 (citing *Phillips v. State*, 650 S.W.2d 396, 401 (Tex. Crim. App. [Panel Op.] 1983). In such cases, a "defendant may be justified in filing a motion to dismiss, rather than a motion for a speedy trial, as a 'means of alerting the trial court and the State of the delay and appellant's lack of acquiescence to it, and not necessarily [as] an attempt to escape trial completely.'" *Gonzalez v. State*, No. 08-16-00287-CR, 2018 WL 6061274, at *11 (Tex. App.— El Paso Nov. 20, 2018, no pet.) (not designated for publication) (citing *Zamorano*, 84 S.W.3d at

35

651 n.40 (where defendant filed a motion to dismiss on speedy trial grounds but stated that he was asking for a speedy trial at a pretrial hearing, the court concluded that "the motion to dismiss was a means of alerting the trial court and the State of the delay and appellant's lack of acquiescence to it, and not necessarily an attempt to escape trial completely")). "Each case must turn on its own facts, and the particular relief a defendant seeks is but one factor to consider." *Lopez*, 631 S.W.3d at 116. But the court has cautioned that if a "defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure." *Cantu*, 253 S.W.3d at 283.

During the six years and over seven months that he was in custody awaiting trial, Galvan's attorneys filed one written request for a speedy trial, made one oral request for a speedy trial, and filed one written request seeking both a speedy trial, or in the alternative, dismissal of his case.[17] We review each request separately.

Galvan's first motion for speedy trial was filed on April 10, 2019, two years and over two months after his initial arrest on January 29, 2017. The motion was filed after none of the trial court's four trial settings between October of 2017 and November of 2018 were reached. In his motion, Galvan pointed out that the trial court had noticed a fifth trial setting for May 2, 2019, and he requested that trial commence on that date. While there is nothing in our record to indicate the

---

[17] The clerk's record also contains at least two handwritten letters from Galvan to the court after his first trial. In his first letter, which was written in December of 2021, Galvan complained that he had been in jail unable to make bond since his arrest in 2017, and his continued incarceration was having a negative effect on him. Although Lizarraga acknowledged at the January 2022 "emergency hearing" that he had read the letter, he indicated that he had not considered it because it was ex parte. The file contains a second letter from Galvan to Ables dated April 4, 2023, complaining about his inability to make bond, about the jail conditions, about his inability to assist his attorney in preparing his defense, and stating that he had "repeatedly" asked his attorney to file a motion for speedy trial, but that his attorney had ignored his requests. However, the file indicates that Ables did not read the letter. Although a judge has the discretion to consider such letters, nothing in the record suggests that the trial court considered and ruled on them. *See, e.g.*, *Laird v. State*, 691 S.W.3d 30, 41–42 (Tex. App.—Austin 2023, pet. ref'd) (recognizing that "many of our sister courts have held that pro se filings such as Laird's are not assertions of the speedy-trial right under *Barker* absent evidence in the record that they were considered and ruled on by the trial court"). We therefore do not consider them in our analysis.

motion was presented to or ruled on by the trial court, Galvan's first trial commenced on May 9, 2019, seven days after the May 2nd trial setting.

Galvan's motion did not seek dismissal of his case, and was instead directed at seeking to ensure that his trial did take place as scheduled. His motion is therefore some evidence of his desire for a trial at that time. But allowing over two years to pass before filing the motion, and doing so on the eve of trial when a trial setting was already in place, bodes against a finding that Galvan made a timely assertion of his speedy trial right prior to his first trial. *See Dragoo*, 96 S.W.3d at 314–15) (concluding that defense counsel's motion for a speedy trial, which was filed three-and-a-half years after defendant's arrest and on the eve of trial, was not a timely assertion of the defendant's speedy trial right); *see also Kelly v. State*, 163 S.W.3d 722, 729 (Tex. Crim. App. 2005) (concluding that because the defendant's "assertion [of his speedy trial right] was tardy . . . was made only once, and trial occurred within a relatively short time thereafter," this factor weighed against the defendant).

We similarly find that Galvan's second assertion of his right to a speedy trial was not timely. Galvan's second assertion was made almost four years after Galvan's first trial ended in a mistrial. The request was made at a status hearing on April 20, 2023, when Ables informed the parties that he could not hold a jury trial until January of 2024. At the hearing, Galvan's counsel informed Ables that his client was "interested in a quicker date than that if possible in light of the fact that he has been held in custody without conviction for I think five years now approximately." Although this request was not in writing, we treat it as a valid invocation of Galvan's right to a speedy trial. *See Lopez,* 631 S.W.3d at 116 (recognizing that defendant "asserted his right to a speedy trial on that same date, first by orally asserting his right [at a hearing] and also by filing a written Motion for Speedy Trial after the hearing"); *Walton v. State*, No. 05-22-01045-CR, 2023 WL 4195774, at *3 (Tex. App.—Dallas June 27, 2023, pet. ref'd) (recognizing that defendant

37

"orally invoked the right to a speedy trial" at a hearing). Nevertheless, given the significant delay between Galvan's mistrial in May of 2019 and his attorney's next assertion of his right to a speedy trial almost four years later in April of 2023, we cannot view it as a timely invocation of the right. Instead, we conclude that the significant length of the delay in bringing the motion indicates that Galvan acquiesced in the delay. *Balderas*, 617 S.W.3d at 771.

Finally, three months later, on July 24, 2023, Galvan filed his written "MOTION FOR SPEEDY TRIAL AND FOR DISMISSAL FOR FAILURE TO AFFORD THE ACCUSED A SPEEDY TRIAL[.]" The motion starts out by stating that "Galvan previously requested a speedy trial in writing (Exhibit 1) and he continues to demand a speedy trial." The motion, however, also states that Galvan was seeking dismissal given the lengthy delay in setting his case for trial. Though the trial court did not immediately rule on the motion, on July 27, 2023, it issued an order setting the matter for trial on September 18, 2023. Thereafter, treating Galvan's motion as a motion to dismiss, Alcala heard and overruled it August 24, 2023, concluding that although the delay was "presumptively prejudicial," the prejudice was "overcome by the facts . . . and the procedural history" of the case, including the fact that much of the delay was caused by the pandemic.

Although Alcala treated the motion solely as a motion to dismiss, we recognize that Galvan also requested a speedy trial and we therefore cannot say that the motion should automatically weigh against Galvan's assertion of his right. *See Montez v. State*, No. 04-23-01011-CR, 2024 WL 4614587, at *3 (Tex. App.—San Antonio Oct. 30, 2024, no pet.) (mem. op., not designated for publication) (holding that because the defendant filed a motion to dismiss, and in the alternative for speedy trial, but primarily sought dismissal, the "alternative request for relief does not automatically weigh against [the defendant]"); *see also Sanchez v. State*, No. 01-17-00751-CR, 2018 WL 6377140, at *3 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, no pet.) (mem. op., not designated for publication) (the court held that because the defendant "made alternative

38

requests for dismissal or a speedy trial," his "request for dismissal does not heavily undercut his speedy-trial claim"). In addition, at the hearing, as well as in his motion, defense counsel set forth the reasons why he believed dismissal was proper, assigning blame to the State for most of the delay, beginning with the mistrial, contending the delay was presumptively prejudicial to his client, and Galvan was suffering actual prejudice due to his inability to find certain witnesses to prepare for trial. Nevertheless, because this motion came over four years after Galvan's initial mistrial, and because Galvan acknowledged in other contemporaneously filed motions that his case had already been set for trial in September, we cannot say that this motion was a timely invocation of Galvan's right to a speedy trial.

Although Galvan made three requests for a speedy trial, because we conclude that the motions were not made in a timely manner, this factor weighs against Galvan, albeit only slightly.

### (4) Prejudice to Galvan

The fourth *Barker* factor encompasses any prejudice to the defendant because of the length of delay. Galvan carries the burden to show some prejudice, but a showing of actual prejudice is not required. *Balderas*, 517 S.W.3d at 772. In determining whether a defendant has been prejudiced, we consider the three interests a speedy trial is intended to guarantee: "(1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Id.* at 772. Of these interests, the third "is the most important because the fairness of the criminal-justice system is distorted when a defendant is unable to adequately prepare his defense." *Id.*

The Court of Criminal Appeals has recognized that in some instances, a delay in bringing a criminal case to trial may be so excessive that it should be considered "presumptively prejudicial," thereby absolving the defendant of the initial burden of demonstrating prejudice. *See Gonzales*, 435 S.W.3d at 812 (citing *Doggett*, 505 U.S. at 653) (examined in more depth the role

39

that excessive delay and presumptive prejudice play in the impairment of a defendant's ability to present a defense). This is because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter identify[.]" *Hopper*, 520 S.W.3d at 923–24. If the presumption applies, the accused is "absolved from the requirement to demonstrate prejudice" from the delay. *Gonzales*, 435 S.W.3d at 812. The burden then shifts to the State to either prove the accused acquiesced in the delay or to persuasively rebut the presumption of prejudice. *Id.* at 814–15.

We look to the total period of delay in determining whether the presumption applies. *See Shaw*, 117 S.W.3d at 890 (even though it found that the State was not responsible for all of the delays, the court held that "we must presume that the lengthy delay here [38 months] did adversely affect appellant's ability to defend himself, but this presumption is extenuated by appellant's longtime acquiescence in the delay"). Here, we find that the delay of six years and over seven months between Galvan's arrest and a final verdict in his case was sufficient to apply the presumption of prejudice. *See Gonzales*, 435 S.W.3d at 813–14 (concluding that due to a total delay of six years between indictment and defendant's arrest, prejudice to the defendant's ability to defend himself was presumed and burden shifted to State to persuasively rebut presumption, which State was unable to do); *Zamorano*, 84 S.W.3d at 654 (four-year delay between defendant's arrest and trial was presumptively prejudicial to defense). The burden thus shifted to the State to either demonstrate that Galvan acquiesced in the delay or to otherwise rebut the presumption.[18]

As explained above, based on the record before us, we conclude that Galvan acquiesced in much of the delay. Galvan waited over two years and two months to make the first motion for a

---

[18] Although Galvan argued in his brief that the presumption of prejudice applies to his case given the length of the delay, the State did not address the presumption or the two factors that could be used to rebut the presumption; instead, it only argued that Galvan failed to establish any actual prejudice. However, because the State did allege at other points in its brief that Galvan acquiesced in at least some of the delays and because it directly addressed the issue of whether Galvan suffered any actual prejudice, we address both issues in our analysis.

speedy trial, and did so on the eve of trial. After the mistrial in May of 2019, he not only requested a continuance of his August 2019 trial date, but he allowed a January 2019 trial setting to pass without bringing another motion for speedy trial or otherwise requesting a trial setting.

We recognize that the COVID-19 Pandemic caused a delay beginning in March of 2020, for which Galvan could not be said to have acquiesced. However, Galvan did not immediately request a speedy trial when the courts reopened. Instead, shortly thereafter, he filed his habeas petition and requested a stay of the trial while his appeal from the denial of his habeas petition was pending. Finally, on July 24, 2023, Galvan filed his written "MOTION FOR SPEEDY TRIAL AND FOR DISMISSAL FOR FAILURE TO AFFORD THE ACCUSED A SPEEDY TRIAL[.]" but did so after recognizing in other pretrial motions that he contemporaneously filed that a trial date had already been set for September of that year.

We therefore conclude that the presumption of prejudice was extenuated by Galvan's acquiescence in the delay. *See Hopper*, 520 S.W.3d at 929 (noting that any presumptive prejudice due to passage of time was extenuated by defendant's acquiescence to delay); *Shaw,* 117 S.W.3d at 890 (finding that "appellant's longtime acquiescence in the delay" extenuated any presumptive prejudice") (citing *Dragoo,* 96 S.W.3d at 315).

Having eliminated the presumption of prejudice due to Galvan's acquiescence, we next consider whether Galvan met his initial burden of making a particularized showing of prejudice. *See Hopper*, 520 S.W.3d at 929 (after eliminating the presumption of prejudice, court reviewed record to determine if the defendant had met his burden of showing "any particularized prejudice" stemming from the delays in his case).

Taking into consideration the first two interests the right to a speedy trial is meant to protect, i.e., preventing oppressive pretrial incarceration and minimizing the anxiety and concern of the accused, we conclude that there is sufficient evidence from which we may infer that Galvan

41

was prejudiced in both respects. Galvan was incarcerated for six years and over seven months following his arrest prior to the verdict in his second trial, as he was unable to post a bond during that time and his bond was never lowered despite numerous requests.[19] Although Galvan did not testify in court to the anxiety that he suffered during that time, in January of 2021 after the trial court denied multiple motions to reduce Galvan's bond, defense counsel filed a "MOTION FOR PSYCHOLOGICAL EVALUATION OF DEFENDANT[,]" asserting Galvan was "experiencing mental issues due to the long-term effect of incarceration." The State has not pointed to anything in the record to rebut the presumption that Galvan was prejudiced in these two respects.

The key issue, however, is whether Galvan met his burden of establishing that the delay prejudiced his ability to defend himself at his second trial. Reviewing the record of both his first and second trials leads us to conclude he did not meet this burden. In his brief on the merits, Galvan contends that one of his witnesses, Richard Pendell, could no longer clearly remember the events of the night of the shooting due to the passage of time.[20] Pendell was a bar patron who arrived in the parking lot just before the shooting. Galvan called Pendell to show there had been a fight before the shooting to support his self-defense claim. Pendell testified that before hearing gunfire, he recalled a commotion but stated the details of that evening were hazy due to the passage of time. However, as the State points out, Galvan was able to use Pendell's police statement taken shortly after the shooting to refresh his recollection and confirm Pendell heard a "fight" before the shooting. Moreover, as the State also points out, although Pendell testified that he could not remember the events, the main thrust of his testimony was that he never witnessed anything of significance because it was dark, he was far away from the incident, and he could not clearly see

---

[19] Galvan's attorneys filed numerous requests for bond reductions (in November 2018, June 2019 November 2019, August 2020 and January 2022). The trial court denied each of those motions.

[20] It does not appear that Pendell testified at Galvan's first trial.

what was happening. We therefore do not find Pendell's inability to clearly recall the events the night of the shooting to have hampered Galvan's defense in any significant respect.

In addition, the State points out that "[n]o witness was ever mentioned as missing by Galvan."[21] There is nothing to suggest that any of the other witnesses who testified at Galvan's second trial were unable to recall any of the events in question due to the passage of time. Accordingly, we agree with the State that the record does not show that Galvan's defense at his second trial was prejudiced by the delay. *See Temple v. State*, No. 14-23-00290-CR, 2025 WL 1799799, at *28 (Tex. App.—Houston [14th Dist.] July 1, 2025) (pet. ref'd) (finding no prejudice to the appellant's defense where appellant did not direct the court to any witnesses who would have or may have offered additional exculpatory evidence had the defendant's second trial occurred sooner than it did).

Given that the record supports a finding that Galvan suffered prejudice with respect to the effect that his pretrial incarceration had on him, but not that it affected his ability to defend himself, we assess this fourth *Barker* factor at most only slightly favoring Galvan.

### (5) Balancing the factors

While we rely on the trial court's first-hand view to decide facts, we balance the four factors de novo. *Balderas*, 517 S.W.3d at 768. Our de novo review is guided by the Texas Court of Criminal Appeals' cautionary comments:

> Because dismissal of the charges is a radical remedy, a wooden application of the *Barker* factors would infringe upon "the societal interest in trying people accused of crime, rather than granting them immunization because of legal error." Thus, courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. The constitutional right is that of a speedy trial, not dismissal of the charges.

---

[21] At trial, Galvan again moved to dismiss the case when one witness, Adrian Estrada, was thought to have failed to honor his subpoena. But Estrada did appear after both sides closed, and the trial court allowed Galvan to reopen to call him as a witness.

*Cantu*, 253 S.W.3d at 281 (quoting *United States v. Ewell*, 383 U.S. 116, 121 (1966) (footnotes omitted)).

The six years and over seven months of delay weighs heavily in Galvan's favor. However, there is no evidence that the State intentionally caused any of the delays. And although we have assessed slightly more than half of the overall delay to the State due to its official negligence in not bringing Galvan to trial sooner, we have also attributed a significant portion of the delay—over two-and-a-half years—to neutral factors that were out of the parties' control, such as the COVID-19 period, which cannot be blamed on either party. We have also concluded that Galvan acquiesced in much of the delay, and although Galvan filed three requests for a speedy trial, we have concluded that they were not filed in a timely manner and there is no evidence that the first one was brought to the court's attention. Finally, although we recognize that Galvan suffered prejudice from being incarcerated throughout the period of delay, he failed to show that his defense was impaired by the delay.

Accordingly, we conclude that a holistic balance of the four factors does not support Galvan's claim.

Galvan's Issue Six is overruled.

## IV. EXCLUSION OF EXPERT OPINION

In his third issue, Galvan challenges the trial court's exclusion of his psychologist expert witness. We conclude that the trial court did not abuse its discretion in doing so.

### A. The challenged opinion and the trial court's ruling

At a pretrial hearing held on September 1, 2023, the parties informed the trial court that Galvan intended to have Dr. James Shutte, a licensed psychologist, testify during the guilt-innocence phase of his trial relative to his self-defense claim. Although the State expressed concern that Shutte's testimony might not be admissible, it nevertheless argued that if the trial court

44

admitted Shutte's testimony, the State was "entitled to have the defendant examined by our expert." The trial court denied the State's request to have its own expert examine Galvan but deferred ruling on whether it would admit Shutte's testimony.

During trial, when Galvan proffered Shutte as an expert witness, the trial court held a hearing outside the presence of the jury to determine the admissibility of his testimony. At the hearing, Shutte testified to his qualifications, averring that he had conducted hundreds of assessments of criminal defendants to determine their competency to stand trial, assess their "mental state at the time of the alleged offense, their insanity," and examine factors pertaining to mitigation in sentencing matters. The State did not contest Shutte's qualifications as an expert witness but did question whether Shutte could provide relevant evidence that would assist the jury in determining Galvan's guilt.

Regarding his proposed testimony, Shutte explained at the hearing that he had interviewed Galvan and administered a battery of tests, whereupon he diagnosed Galvan with post-traumatic stress disorder (PTSD), major depressive disorder, and a neurocognitive disorder. Shutte further opined, based on the information he had received, which included witness statements, that Galvan had been suffering from PTSD at the time of the shootings, which was caused by his previous violent interactions with Franco and his group. And Schutte believed that Galvan's PTSD contributed to his subjective beliefs that Franco and Ortega were using or attempting to use unlawful deadly force against him; that his life was at risk; that he believed his use of deadly force in response was immediately necessary; and that it was necessary to continue shooting until the gun was fully discharged to save his life. Shutte further explained his belief that multiple factors could have contributed to Galvan's belief that his life was in danger, including that it was dark out and that he faced multiple assailants. According to Shutte, these factors would have also caused a "reasonable" or "prudent" person in Galvan's position to believe his life was in danger and the use

45

of force was immediately necessary to save his life. On cross-examination, however, Shutte acknowledged that he was not expressing an opinion that Galvan was legally insane or that he was incapable of forming the "requisite intent to fire [the] weapon."

After Shutte finished testifying, the State objected to the admission of his testimony, arguing his opinion regarding Galvan's mental condition at the time of the shooting would only be admissible if it negated Galvan's culpable mental state. In turn, the State pointed out that Shutte expressly acknowledged that Galvan's mental condition did not prevent him from having the requisite intent to shoot his victims. The State further argued that Shutte's testimony would not assist the jury in determining whether a reasonable person in Galvan's position would have believed it was immediately necessary to use deadly force against the victims, as the jury was fully capable of making that determination on its own. Defense counsel, however, argued that Shutte's testimony would "assist the jury to help to understand why Mr. Galvan felt the fear that he did" in support of his self-defense claim.

The trial court sustained the State's objection, agreeing that Shutte's proposed testimony did not reflect on whether Galvan acted intentionally in shooting the victims, and therefore did not negate Galvan's mens rea. The court instead found that Shutte's testimony would, at most, reflect on whether Galvan was being truthful in testifying that he believed his life was in danger when he shot the individuals. The court indicated that it was within the jury's province to determine whether it was "reasonable" for Galvan to believe that he needed to use deadly force under the circumstances, and Shutte's testimony would not assist the jury in determining that issue.

Galvan argues the trial court's decision to exclude Shutte's testimony was in error.

**B. Standard of review**

We review a trial judge's decision to admit or exclude evidence under an abuse-of-discretion standard. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court

46

abuses its discretion when the decision falls outside the zone of reasonable disagreement. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Stated otherwise, the trial court abuses its discretion when it acts "without reference to any guiding rules and principles or acts arbitrarily or unreasonably." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019).

"[I]f the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial judge gave the wrong reason for his right ruling." *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009).

### C.   Admissibility of expert testimony

Texas Rule of Evidence 702 governs the admission of expert testimony, providing that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. The rule embodies qualification, reliability, and relevance requirements: (1) that the expert is qualified; (2) that the testimony is based on a reliable scientific foundation; and (3) that the testimony is relevant to the issues in the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

An expert's opinion must also be helpful to the jury. Tex. R. Evid. 702. Thus, the expert's knowledge and experience on a relevant issue must be beyond that of the average juror, and his testimony must help the jury understand the evidence or determine a fact issue. *See Duckett v. State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990) (en banc), *overruled on other grounds by Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993) (en banc). Under this standard, the expert must have "some specialized knowledge on the topic that will 'assist' the jury." *Coble v. State*, 330 S.W.3d 253, 288 (Tex. Crim. App. 2010). Thus, "[t]he question under Rule 702 is not

whether the jurors know something about this subject, but whether the expert can expand their understanding in a relevant way." *Id.*

Historically, courts have resisted allowing a witness—even an expert—to testify to the state of mind of another person. *See Winegarner v. State*, 505 S.W.2d 303, 305 (Tex. Crim. App. 1974), *overruled on other grounds by White v. State*, 576 S.W.2d 843, 845 (Tex. Crim. App. 1979) (en banc) (upholding exclusion of expert psychiatrist who examined murder defendant and would testify to "hypothetical question that the facts related to him by [the defendant] were 'capable of being interpreted in a way other than having a present intent to commit murder'"); *Jackson v. State*, 548 S.W.2d 685, 692–93 (Tex. Crim. App. 1977) (upholding exclusion of expert who would have testified to the defendant's "state of mind at the time of the alleged offense" based upon "hearsay" statements made to the expert); *Fairow v. State*, 943 S.W.2d 895, 896 (Tex. Crim. App. 1997) (en banc) (stating "[i]t is impossible for a witness to possess personal knowledge of what someone else is thinking. The individual is the only one who knows for certain the mental state with which he is acting").

However, "expert testimony regarding a defendant's state of mind or intent has been held admissible in limited circumstances," including, as relevant here, "where such testimony may be relevant to rebut or disprove the defendant's culpable *mens rea.*" *Moseley v. State*, No. 14-20-00233-CR, 2022 WL 1416726, at *2 (Tex. App.—Houston [14th Dist.] May 5, 2022, no pet.) (citing *Dooley v. State*, 582 S.W.3d 309, 312 (Tex. App.—Fort Worth 2018, no pet.) (collecting cases)).

The Texas Court of Criminal Appeals discussed the admissibility of expert witness testimony to rebut or disprove a defendant's culpable mens rea at length in *Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008). As a preliminary matter, the court recognized that under Texas law, "[i]nsanity is the only 'diminished responsibility' or 'diminished capacity' defense to

48

criminal responsibility in Texas." *Id.* at 593. However, the court noted that "both physical and mental diseases or defects may affect a person's perception of the world just as much as they may affect his rational understanding of his conduct or his capacity to make moral judgments." *Ruffin*, 270 S.W.3d at 593. Thus, the court held that even in cases in which a defendant does not claim insanity, both lay and expert testimony regarding a "mental disease or defect offered to rebut or disprove the defendant's culpable *mens rea*" is admissible at trial.[22] *Id.* at 594 (recognizing a defendant's right to present his defense at trial, which includes the right to present evidence to dispute the elements of the offense, including his *mens rea,* and that "expert evidence might be relevant, reliable, and admissible to rebut proof of the defendant's *mens rea.*"). Stated otherwise, the court held that there is no "blanket ban" on "expert evidence [that] might be relevant, reliable, and admissible to rebut proof of the defendant's *mens rea.*" *Id*. at 595.

A court, however, may still exclude the evidence "if it does not truly negate the required mens rea" required for a particular offense. *Id*. at 596; *see also Mays v. State*, 318 S.W.3d 368, 381–82 (Tex. Crim. App. 2010) (acknowledging that trial court was not required to admit expert testimony concerning defendant's mental illness during guilt stage of trial where "it [did] not directly rebut his culpable *mens rea*").

---

[22] In *Ruffin*, the court noted that Tex. Code Crim. Proc. Ann. art. 38.36(a) allows the State or the defendant in a murder case to "offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." *Ruffin v. State*, 270 S.W.3d 586, 591 n.10 (Tex. Crim. App. 2008) (citing *Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005) (relying on Article 38.36(a) for the proposition that, "[a]s with the other elements of the offense, relevant evidence may be presented which the jury may consider to negate the *mens rea* element [to] include evidence of a defendant's history of mental illness.)). The court, however, held that the rule allowing expert testimony to negate a defendant's mens rea was not limited solely to murder cases and thus held that such testimony was admissible to negate the necessary mens rea in other cases of intentional crimes, including the offense of aggravated assault, which the defendant was charged with in that case. *Id.* at 595–97 (concluding that "expert evidence that would explain appellant's mental disease and when and how paranoid delusions may distort a person's auditory and visual perceptions is admissible as it relates to whether appellant intended to shoot at police officers, unless that evidence is otherwise barred by evidentiary rules); *see also Crumley v. State*, 713 S.W.3d 764, 769–70 (Tex. Crim. App. 2024) (reaffirming the principle set forth in *Ruffin* that a defendant may proffer evidence of a "mental disease or defect offered to rebut or disprove the defendant's culpable *mens rea*" in case where defendant was charged with solicitation of a minor).

### D. The mens rea required for murder and aggravated assault

Here, Galvan was charged with murder, which required the State to prove that he acted intentionally or knowingly in shooting Franco. *See* Tex. Penal Code Ann. § 19.02(b)(1)–(2) (A person commits murder if he "intentionally or knowingly causes the death of an individual [or] intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual."). For the charge of aggravated assault with a deadly weapon causing serious bodily injury to Ortega, the State was required to prove that Galvan acted intentionally, knowingly, or recklessly in shooting Ortega.[23] *See* Tex. Penal Code Ann. § 22.02 ("A person commits aggravated assault if he intentionally, knowingly, or recklessly causes serious bodily injury to another.").

As set forth above, at trial, Galvan did not deny that he shot the men, but he claimed a justification for the shooting, i.e., self-defense, in accordance with § 9.31 of the Texas Penal Code. Section 9.31 provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31. A claim of self-defense does not negate the mens rea necessary to support a conviction for murder or aggravated assault. To the contrary, a claim of self-defense is a "confession-and-avoidance" justification, which requires some evidence that the defendant intended to kill or cause bodily injury to his victim. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) ("Self-defense is a

---

[23] "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c).

confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct."); *Rodriguez v. State*, 629 S.W.3d 229, 231–32 (Tex. Crim. App. 2021) (concluding that a defendant was entitled to a self-defense instruction where there was sufficient evidence to support a finding that he had an intent to kill where the defendant admittedly used a gun that was fired at the victim at close range). In other words, a defendant "cannot both invoke self-defense and flatly deny the charged conduct." *Jordan*, 593 S.W.3d at 343.

### E. Analysis

Shutte's testimony regarding his belief that Galvan was suffering from PTSD at the time of the shooting would have only been admissible if it negated the necessary mens rea for either murder or aggravated assault. *Ruffin*, 270 S.W.3d at 596. His testimony had to do more than provide a justification or excuse for Galvan's actions; it must have instead addressed that Galvan was prevented from forming the requisite mental state necessary to either kill or cause serious bodily injury to the men. *Garcia v. State*, No. 01-16-00541-CR, 2018 WL 4129869, at *7 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. ref'd) (mem. op., not designated for publication) (citing, inter alia, *Nikmanesh v. State*, No. 05-16-00363-CR, 2017 WL 2774445, at *3 (Tex. App.—Dallas June 27, 2017, no pet.) (mem. op., not designated for publication).

Shutte did not propose to testify that Galvan's mental condition affected his ability to form the requisite mental state to commit murder or aggravated assault; instead, his proffered testimony would have only supported Galvan's claim of self-defense as a justification or excuse for his actions in using deadly force, given his prior encounters with Franco and his group. His proposed opinion was limited to whether Galvan's PTSD would have led him to believe that the use of deadly force was immediately necessary; he expressly stated that he did not believe Galvan was legally insane at the time of the shooting or that Galvan was incapable of forming the "requisite intent to fire [the] weapon."

In a similar situation, a defendant charged with murder admitted that he shot an individual but claimed that he did so in self-defense. *Garcia v. State*, No. 01-16-00541-CR, 2018 WL 4129869, at *2 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. ref'd) (mem. op., not designated for publication). At trial, the defendant sought to introduce the testimony of an expert witness who had diagnosed him with PTSD to explain why the defendant harbored a belief that the victim had threatened him and why he believed the use of force was necessary. *Id.* at *5–7. Our sister court held that the expert's testimony was properly excluded as it did not address the defendant's "inability to form the intent to kill the [victim] or his capacity to act with knowledge of his conduct and its consequences[,]" and that it instead only provided "an explanation or excuse as to why appellant shot the [victim]." *Id.* at *7. In other words, the court concluded that the testimony was properly excluded because it did not negate the requisite mens rea for the offense of murder, relating instead only the defendant's justification for the shooting. *Id.*; *Mata v. State*, No. 01-22-00616-CR, 2023 WL 3063394, at *5–7 (Tex. App.—Houston [1st Dist.] Apr. 25, 2023, pet. ref'd) (mem. op., not designated for publication) (expert's proposed testimony was properly excluded where it at most explained why the defendant "could have perceived the complainants as threats to him, but it in no way 'directly rebut[s]' the culpable mental states for the charged offenses") (citing *Johnson v. State*, Nos. 01-19-00776-CR, 01-19-00818-CR, 2022 WL 963277, at *12–13 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022, pet. ref'd) (mem. op., not designated for publication) (affirming exclusion of expert testimony as to why defendant committed charged offenses because testimony did not directly rebut culpable mental state for crimes but rather explained why defendant perceived complainants as threats)); *Williams v. State*, 502 S.W.3d 262, 276 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (concluding that appellant's offer of proof that his expert believed he suffered from PTSD was not admissible where "the proffer contained

nothing from [the expert] about appellant's ability or inability to form the intent to kill [his victim] or his capacity to act with knowledge of his conduct and its consequences").

Galvan maintains that courts in other cases have allowed defendants to introduce expert witness testimony to support a claim of self-defense. But in each of the cases he cites, the issue on appeal was whether the evidence supported the jury's rejection of the defendant's self-defense claim, not whether the expert evidence was admissible in the first instance.[24] Here, the question before us is the admissibility of such evidence. As explained above, because Shutte's testimony did not negate the necessary mens rea of the offenses with which he was charged, and only related to his justification for the shooting, the trial court properly excluded the testimony.[25]

Further, as the trial court observed, rather than negating any element of the offenses charged, Shutte's proffered testimony would have pertained to whether Galvan was being truthful in testifying that he perceived Ortega and Franco as threats that justified the use of deadly force to support his claim of self-defense. Thus, the court was also following the long-held limitation of

---

[24] *See Kitchens v. State*, No. 01-18-00518-CR, 2019 WL 6482408, at *1 (Tex. App.—Houston [1st Dist.] Dec. 3, 2019, pet. ref'd) (mem. op., not designated for publication) (noting defense's use of firearms expert who testified to appropriate use of deadly force); *Vasquez v. State*, No. 03-19-00564-CR, 2021 WL 126778, at *1 (Tex. App.—Austin Jan. 14, 2021, no pet.) (mem. op., not designated for publication) (noting defense expert who testified to defendant's PTSD, which caused him to become easily upset and have difficulty controlling his anger); *Jones v. State*, No. 05-15-01012-CR, 2017 WL 3275995, at *1 (Tex. App.—Dallas July 25, 2017, pet. ref'd) (mem. op., not designated for publication) (noting defense expert who testified that the defendant suffered from anxiety, depression, and PTSD, and could have had a reasonable belief in defending himself); *see, e.g.*, *Garcia*, 2018 WL 4129869, at *6 (although not the issue before it, the court noted that the trial court allowed an expert to testify to how the defendant's PTSD would have affected his perception of the danger he faced in defending himself).

[25] Galvan also relies on our holding in *Muhammad v. State*, 46 S.W.3d 493 (Tex. App.—El Paso 2001, no pet.) for the proposition that we have found expert witness testimony admissible to demonstrate how a defendant's mental illness could influence his conduct in contexts other than those involving self-defense. In *Muhammad*, however, we were considering the admissibility of expert witness testimony during the punishment phase of a trial to establish that the defendant killed his victim in an "emotionally charged fight" due to his psychological background rather than as part of an intentional plan. *Muhammad*, 46 S.W.3d at 498–502. We concluded it was error for the trial court to exclude the testimony at sentencing. But as we explained in that case, different standards of admissibility are at play in the punishment phase versus the guilt-innocence phase. *Id*. at 498–99. As a matter of policy, during the punishment phase of trial, a trial court has more leniency in admitting evidence of "[m]itigating circumstances" that create an "excuse" for the defendant's behavior and would support a finding that the defendant was "less culpable than other who have no such excuse." *Id.* at 498. Here, we do not consider whether Shutte's testimony would have been admissible at sentencing.

testimony on the truthfulness of a witness. *See Yount v. State*, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993) (en banc) ("We hold that Rule 702 does not permit an expert to give an opinion that the complainant or class of persons to which the complainant belongs is truthful.").

Accordingly, we conclude that the trial court did not abuse its discretion in excluding Shutte's testimony at the guilt-innocence phase of his trial.

Galvan's Issue Three is overruled.

## V. SELF-DEFENSE INSTRUCTIONS

In his first and second issues, Galvan complains that the trial court erred in omitting instructions from the jury charge on self-defense.

As set forth above, Galvan defended both the murder and aggravated-assault charges by claiming self-defense. The charge as given contained self-defense instructions stating:

> A person's use of deadly force against another that constitutes the crime of Murder is justified by self-defense when the person reasonably believed the degree of force used was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force.

> If a person reasonably believes he is threatened with the use or attempted use of unlawful deadly force against him by a group of two or more people, he may use deadly force against any or all of them.

> Self-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant.

> The defendant is not required to prove self-defense. Rather, the state must prove, beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct.

> "Reasonable belief" means a belief that an ordinary and prudent person would have held in the same circumstances as the defendant.

> "Deadly force" means force that is intended or known by the person using it to cause death or serious bodily injury or force that in the manner of its use or intended use is capable of causing death or serious bodily injury.

54

To decide the issue of self-defense, you must determine whether the state has proved, beyond a reasonable doubt, one of the following two elements. The elements are that—

1. the defendant did not believe his use of force was immediately necessary to protect himself against Rogelio Franco, David Ortega or any other's use or attempted use of unlawful deadly force; or

2. the defendant believed his use of force was immediately necessary to protect himself, but the defendant's belief was not reasonable.

A similar instruction was given for the aggravated-assault count and for the lesser-included offenses of deadly conduct.

In his first issue, Galvan contends the trial court erred by not refusing to provide the jury with an instruction informing the jury that it could presume that his conduct was reasonable under specified circumstances. In his second issue, he contends the trial court erred in refusing to provide the jury with an instruction that he had no duty to retreat. For the reasons set forth below, we disagree with both arguments.

## A. Applicable law

The trial court is required to give the jury a written charge "setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *Vega v. State*, 394 S.W.3d 514, 518 (Tex. Crim. App. 2013). Self-defense is "law applicable to the case" and must be included in the jury charge if raised by the evidence. *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Jordan*, 593 S.W.3d at 343 (citing *Shaw*, 243 S.W.3d at 657–58).

A person is justified in using non-deadly force against another when and to the degree that person reasonably believes the force is immediately necessary to protect himself against another person's use or attempted use of unlawful force. Tex. Penal Code Ann. § 9.31(a). A person is justified in using deadly force if he would be justified in using non-deadly force under § 9.31, and

55

he reasonably believes that deadly force is immediately necessary to protect himself against another's use or attempted use of deadly force. *Id*. § 9.32(a)(2)(A). "The 'reasonably believes' language contains subjective and objective components." *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). To properly raise self-defense and be entitled to a self-defense instruction, Galvan must have presented evidence that he subjectively believed Franco or Ortega used or attempted to use deadly force against him and that his use of deadly force was immediately necessary. *Id*. And Galvan's subjective belief must also have been objectively reasonable. *Id*. A reasonable belief is one held by an "ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(a)(42); *Lozano*, 636 S.W.3d 32.

Section 9.32(b) of the Texas Penal Code provides that a defendant's actions are presumed to be reasonable in certain circumstances. The relevant portion of the statute provides:

(b) The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision *is presumed to be reasonable* if the actor:

(1) knew or had reason to believe that the person against whom the deadly force was used:

. . .

(C) was committing or attempting to commit [murder];

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

Tex. Penal Code Ann. § 9.32(b) (emphasis added).

Section 9.32(c) provides that a defendant has no duty to retreat under certain circumstances. The relevant portion of the statute provides:

(c) A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force[.]

Tex. Penal Code Ann. § 9.32(c).

A presumption that favors the defendant, such as the presumption of reasonableness in a self-defense case, must be submitted to the jury "if there is sufficient evidence of the facts that give rise to the presumption . . . unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact[.]" Tex. Penal Code Ann. § 2.05(b)(1); *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011).

## B. Standard of review

"A jury-charge-claim analysis involves two steps: First, we determine whether the charge is erroneous. If it is, then we must decide whether the appellant was harmed by the erroneous charge." *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013); *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) (en banc)). In general, there are two standards of review for jury-charge-error claims. *Id.* at 165 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). When, as here, charge error has been properly preserved, we should reverse if the error resulted in "some harm." *Id.* To decide whether there was some harm, we consider the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011). The harm must be actual, not merely theoretical. *French v. State*, 563 S.W.3d 228, 235 (Tex. Crim. App. 2018).

## C. Application

Maintaining he was entitled to a presumption of reasonableness instruction, Galvan contends that he presented some evidence—based on his own testimony—that Ortega first had the gun, which Galvan only took away when it was thrust in his chest. Galvan argues this established a presumption that his use of force was necessary to prevent Ortega—and Franco—from committing murder. *See* Tex. Penal Code Ann. § 9.32(b) ("The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision *is*

57

*presumed to be reasonable* if the actor . . . knew or had reason to believe that the person against whom the deadly force was used . . . was committing or attempting to commit [murder]").

In arguing he was entitled to a "no duty to retreat" instruction, Galvan contends he provided some evidence to support a finding that he was entitled to the instruction, again based on his own testimony that Ortega and Franco were the aggressors, i.e., the ones who provoked the fight; that he was not engaged in criminal activity at the time of the shooting; and that he had a right to be in the location where the shooting occurred. Tex. Penal Code Ann. § 9.32(c) ("A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force[.]").

The State counters that Galvan was never entitled to any self-defense instruction and that it was error for the trial court to give the instruction. It reasons that once Galvan took the gun away from Ortega (if that is what happened), Galvan had the only weapon, and his use of deadly force was not immediately necessary.[26] Next, the State responds that Galvan was not entitled to the presumption-of-reasonableness instruction unless: (1) he had reason to believe that the person against whom he used deadly force was committing or attempting to commit murder; and (2) Galvan was not otherwise engaged in criminal activity. The State argues Galvan lacked any reasonable belief that Ortega or Franco were attempting to murder him, and when Galvan possessed the weapon, he was in breach of the law by unlawfully carrying a weapon. *See Finch v. State*, No., 05-15-00793-CR, 2016 WL 2586142, at *6 (Tex. App.—Dallas May 4, 2016,

---

[26] For this proposition, the State cites several cases where courts found sufficient evidence to support a jury's implied rejection of a self-defense claim where the defendant took away the weapon the victim had first brandished. *See, e.g.*, *Hernandez v. State*, No. 05-06-01238-CR, 2008 WL 588902, at *5 (Tex. App.—Dallas March 5, 2008, pet. ref'd) (mem. op., not designated for publication) (defendant who claims to have taken gun away from deceased); *Fugon v. State*, No. 14-06-00204-CR, 2007 WL 836712, at *4 (Tex. App.—Houston [14th Dist.] March 20, 2007, pet. ref'd) (mem. op., not designated for publication) (same from struggle over shotgun). We agree with Galvan that those cases do not support the different proposition that proper self-defense instructions are not required of the charge.

pet. ref'd) (mem. op., not designated for publication) (holding that defendant was not entitled to presumption request because he was in violation of felon-in-possession statute at time of shooting).[27]

The State contends that the same arguments answer Galvan's request for the no-duty-to-retreat instruction. Finally, the State maintains Galvan suffered no harm from the absence of the requested instructions. We agree with this no-harm claim and rest our decision there.

Assuming without deciding that the instructions should have been given, we find that the "some harm" standard for reversible error is not met.[28] In assessing harm, we first look to the charge as a whole. *French*, 563 S.W.3d at 235. The erroneous omission of a confession-and-avoidance defense, such as self-defense, "is generally harmful because its omission leaves the jury without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *See Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013). The charge here, however, included the above-mentioned instructions on self-defense that provided an acquittal vehicle. The instructions were included four times: once for the murder, once for the aggravated assault, and again for each of the two lesser-included deadly conduct portions of the charge. The instructions required the jury to consider whether Galvan had a "reasonable belief" that Ortega or Franco were attempting to use unlawful deadly force against him. But, Galvan argues, nothing in

---

[27] The State refers to § 42.06 of the Penal Code, which provides in part "[a] person commits an offense if the person: (1) intentionally, knowingly, or recklessly carries on or about his or her person a handgun; (2) at the time of the offense: (A) is younger than 21 years of age . . . and is not . . . on the person's own premises or premises under the person's control." Tex. Penal Code Ann. § 46.02. We express no opinion regarding whether Galvan was in violation of the Code at the time of the shooting.

[28] The State contends that Galvan never expressly asked for a *deadly force* presumption-of-reasonableness instruction. If the error was not preserved, we would look to see if Galvan suffered egregious harm. *Almanza*, 686 S.W.2d at 171. But we disagree with the State's view of the charge conference. The parties and court understood that the charge addressed the use of deadly force, which was the crux of both the murder and aggravated assault charges. In responding to Galvan's request for this instruction, the State's attorney expressly referenced the "use of deadly force."

the charge instructed the jury on presumptions or that he had no duty to retreat, and he asserts he suffered "some harm" as a result.

In considering the entire state of the evidence, as we must, the argument for "some harm" falters. As noted above, Galvan's self-defense theory relied exclusively on the premise that Ortega possessed the gun initially and was attempting to commit murder when Galvan took it away and fired it to protect himself. However, the evidence on that point is sharply against Galvan. DNA from two contributors was found in the trigger area and on the handle of the gun. That DNA was entirely consistent with Galvan but excluded Ortega and Franco.[29] Galvan's response to the DNA evidence does not get past the hurdle. While he elicited a concession from the DNA analyst that it was "possible" another person's DNA might have been on the gun but not picked up in the swab, the likelihood of that possibility was never quantified. Nor is there any explanation for how Ortega could have wrestled with Galvan over the gun and only Galvan's DNA was left on the gun. Galvan suggested at trial that the shot to Ortega's hand occurred when the gun discharged during the struggle, but the first thing the DNA analyst looked for was blood on the weapon. She found none. And if the jury rejected Galvan's claim that Ortega initially had the gun and that he wrestled the gun away from Ortega out of fear, the trial court's failure to provide the jury with instructions on the presumption of reasonableness and the duty to retreat would have no impact on his case.[30]

In addition, the "ordinary and prudent person" standard also operates to limit a defendant who harbors unreasonable beliefs that the use of deadly force is immediately necessary. *Lozano*,

---

[29] The DNA analyst's report, which was admitted in evidence, stated: "Obtaining this mixture profile is 58.5 quintillion times more likely if the DNA came from Mr. Galvan and an unknown individual than if the DNA came from two unrelated, unknown individuals. Based on the likelihood ratio result, Mr. Galvan cannot be excluded as a possible contributor to the profile. Mr. Franco, Jr. and Mr. Ortega are excluded as contributors to this profile."

[30] We note that at trial, Galvan's attorney asked the bouncer who checked IDs if Franco, Ortega, or Galvan could have bypassed a secondary screening for weapons at the bar. The most the bouncer could say—because he was not doing the screening that night, nor did he witness it—was that Ortega might not have been screened because he was with Franco who was a regular at the bar, but Galvan was not. This testimony was speculative and did not establish who brought the gun to the bar that evening.

636 S.W.3d at 30, 32–33. Here, even assuming the jury believed or could have reasonably believed Galvan's claim that he wrestled the gun away from Ortega, there was no evidence to suggest that either Ortega or Franco posed a deadly threat to Galvan after he came into possession of the gun, such that it was reasonable for Galvan to use deadly force against them. Galvan claimed to have shot Ortega and Franco out of fear that they or other unknown persons in the area might have other weapons. But there was no evidence that Ortega and Franco had any other weapons, and the only other persons in the area were Galvan's companions. Added to this, Galvan fled the scene and gave conflicting statements to the police, initially denying any involvement in the shooting. Later, when confronted with the prospect that the events may have been captured on video, he made the self-defense claim. There was ample evidence from which the jury could have found Galvan's testimony to be incredible, and to have thereby rejected his claim of self-defense. *Braughton v. State*, 569 S.W.3d 592, 611 (Tex. Crim. App. 2018) (finding jury was free to reject appellant's claim of self-defense as "lacking in credibility" (citing *Saxton v. State,* 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991) (en banc) (assessment of credibility of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"; "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory"))). Accordingly, we conclude that the state of the evidence undermines any argument that the absence of the two additional instructions caused Galvan some harm.

The jury arguments also undermine any claim of harm. The State's jury argument was built on the premise that Galvan had the Ruger hidden in his jacket when he went to the Bar Fly. The State never acknowledged that Ortega could have brought the gun and thus never argued that Galvan's actions once he took the gun were unreasonable. Nor did the State claim at trial that Galvan should have retreated after securing the gun from Ortega. Rather, the State's attorney pointed to variations in Galvan's story that he wrestled the gun away from Ortega to argue that it

61

"didn't happen." The State ultimately contended Galvan was mad about having been beaten up several months earlier at the Tipsy Tiger and took the opportunity to get revenge when he saw Franco at the bar the night of the shooting. None of these jury arguments would have caused Galvan harm in terms of the two complained-of instructions.

In sum, considering the entire jury charge, the state of the evidence, the argument of counsel, and other relevant information in our record, we conclude that any harm in the omission of additional self-defense instructions is theoretical and not actual. *See Parker v. State*, No. 06-18-00155-CR, 2019 WL 2843743, at *4 (Tex. App.—Texarkana July 3, 2019, no pet.) (mem op., not designated for publication) ("That said, even assuming, without finding, that the trial court erred when it failed to include the complained-of language in its jury charge, [Appellant] cannot show that she suffered the requisite harm."); *Gonzales*, 474 S.W.3d at 353 (finding error in refusal to submit any self-defense instruction but no harm under the "some harm" standard based on the strength of the evidence and argument of counsel).

Galvan's Issues One and Two are overruled.

## VI. TRANSITIONAL INSTRUCTIONS FOR THE LESSER-INCLUDED OFFENSE

In his fifth issue, Galvan complains that the trial court did not give the jury adequate "transitional" instructions on the procedure to follow in determining if it could acquit Galvan of murder and instead convict him of the lesser-included offense of deadly conduct.

For the murder charge, the jury was initially instructed that to find Galvan guilty of murder, it had to find beyond a reasonable doubt that Galvan (1) "caused the death of Rogelio Franco, by shooting Rogelio Franco with a firearm"; and (2) "did this intentionally or knowingly; [or] . . . intended to cause serious bodily injury, and committed an act clearly dangerous to human life that caused the death of Rogelio Franco." It then instructed the jury that "deadly conduct" was a lesser-included offense of murder and:

> If you all agree the State has failed to prove beyond a reasonable doubt, one or more of the elements 1 and 2, you must find the defendant not guilty and proceed to consider the lesser included offense of Deadly Conduct.

The trial court further instructed the jury that "[a] person commits the offense of deadly conduct if the person knowingly discharges a firearm at or in the direction of one or more individuals." The court again instructed the jury: "Before you may find the defendant guilty of deadly conduct, you must first find him not guilty of murder." In addition, after explaining to the jury the requirements of a self-defense claim, the trial court instructed the jury that if it found the elements of murder beyond a reasonable doubt and if it rejected Galvan's self-defense claim, "you must find the defendant guilty, and do not proceed to consider the offense of deadly conduct as a lesser included offense of murder."

A substantially similar instruction was given for the aggravated-assault charge. Initially, the court instructed the jury that to find Galvan guilty of aggravated assault, it had to find beyond a reasonable doubt that (1) Galvan caused "injury to David Ortega by shooting David Ortega with a firearm"; (2) Galvan did this either intentionally to cause bodily injury, knowing that he would cause bodily injury or with recklessness about whether he would cause bodily injury; and (3) Galvan used or exhibited a deadly weapon during the assault. The court then instructed the jury that if the State failed to prove those three elements beyond a reasonable doubt, "you must find the defendant not guilty and proceed to consider the lesser included offense of deadly conduct."

Galvan did not object to those instructions; however, he requested a "benefit-of-the-doubt" instruction, which would have instructed the jury as follows with respect to both the murder and aggravated-assault counts:

> If you find from the evidence, beyond a reasonable doubt, that the defendant is guilty of murder, or -- of murder on the one hand, or of deadly conduct on the other, and -- but you have a reasonable doubt as to which offense he is guilty, then you must find the defendant guilty of the lesser included offense of deadly conduct.

63

If you find from the evidence, beyond a reasonable doubt, that the defendant is guilty of aggravated assault on the one hand, or of deadly conduct on the other hand, but you have a reasonable doubt as to which offense he is guilty, then you must find the defendant guilty of the lesser included offense of deadly conduct.

The trial court denied both requests.

Galvan contends this was in error and harmed his case.

## A. Standard of review and controlling law

As with Galvan's other jury charge issues, we first examine whether the trial court abused its discretion in framing the charge, then whether any error requires reversal. *Almanza*, 686 S.W.2d at 171.

In assessing jury-charge error, the Court of Criminal Appeals' opinion in *Sandoval* is instructive. There, the defendant was accused of capital murder by committing murder in the course of a robbery, and the trial court instructed the jury on the lesser-included offense of murder. *Sandoval*, 665 S.W.3d at 532. As here, the issue in *Sandoval* was whether the trial court had given the jury proper "transitional" instructions directing it "how to proceed from deliberating about a greater offense to deliberating about a lesser-included offense[,]" and whether the defendant was entitled to a "benefit-of-the-doubt" instruction. *Id.*

There, the court noted that Article 37.08 of the Texas Code of Criminal Procedure requires a jury to acquit a defendant of the greater offense before considering whether to convict him of a lesser included offense. *Id.* at 536 (citing Tex. Code Crim. Proc. Ann. art. 37.08) (providing that "[i]n a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense.") And the court noted two types of transitional instructions that comply with this statute. The first is an "acquittal first" instruction, which instructs the jury that if it has a reasonable doubt that the defendant is guilty of the greater offense, it will first acquit the defendant of that offense and then consider whether the

defendant is guilty of the lesser offense. *Id.* The second is a "modified acquittal first" instruction, "allowing a jury to deliberate in the order it sees fit but requiring that it acquit the defendant of the greater offense before returning a verdict on the lesser offense." [31] *Id.*

In *Sandoval*, the trial court gave the jury an "acquittal first" instruction, which instructed the jury that if it had a reasonable doubt as to the defendant's guilt for capital murder, "you will acquit the defendant of the offense of Capital Murder as alleged in Count I of the indictment, say by your verdict 'Not Guilty,' and proceed to consider whether the defendant is guilty of the lesser included offense of murder." *Id.* at 532. The defendant objected to this instruction[32] and also sought a "benefit of the doubt" instruction similar to the one Galvan requested, which would have instructed the jury as follows:

> If you believe from the evidence beyond a reasonable [doubt] that the defendant is guilty of either capital murder or murder, but you have a reasonable doubt about which offenses he is guilty of, you must resolve the doubt in the defendant's favor. In that situation, you must find him guilty of the lesser offense of murder. *Id.* at 533.

The court recognized that it had previously approved the use of an "acquittal first" instruction in accordance with Article 37.08. *Id.* at 535 (citing *Boyett v. State*, 692 S.W.2d 512, 516 (Tex. Crim. App. 1985) (explicitly approving the use of an acquittal first instruction)). However, it recognized that Article 37.08 does not clearly dictate whether to adopt the "acquittal first" or "modified acquittal first" approach. *Id.* at 537 (recognizing that although Article 37.08

---

[31] Courts in other jurisdictions have utilized two additional approaches to transitional instructions, including giving instructions allowing the jury to consider a lesser-included offense if it was "unable to agree" after using "reasonable effort[s]" on the defendant's guilt of the greater offense, and giving the defendant the option to choose between an "acquittal first" instruction and an "unable to agree" instruction. *Sandoval*, 665 S.W.3d at 537. The defendant in *Sandoval* argued that the trial court should have given the jury an "unable to agree" instruction, but the court disagreed, holding that such an instruction would conflict with "the plain language of Article 37.08," which requires the jury to first acquit the defendant of the greater offense before considering his guilt on the lesser offenses. *Id.* (citing Tex. Code Crim. Proc. Ann. art. 37.08).

[32] As set forth above, the defendant in *Sandoval* sought an "unable to agree" instruction instead of the "acquittal first" instruction, but the court found such an instruction improper under Texas law. *Sandoval*, 665 S.W.3d at 537.

requires the jury to acquit first, it "says nothing about how deliberations must proceed"). The court therefore assumed for purposes of the appeal that the trial court should have given a "modified acquittal first" instruction. *Id.* It further assumed, without deciding, that the trial court should have included a "benefit of the doubt" instruction, as requested by the defendant. *Id.*

However, the court concluded that even assuming error in not giving those instructions, and regardless of the harm standard imposed, the record reflected no harm resulting from the charge as given. *Id*. at 537–38. It noted that the entire charge was read to the jury, so it would be aware of the distinguishing elements between the greater and the lesser-included offenses. *Id*. The court recognized that "the 'acquittal first' instructions required the jury to deliberate, as part of deciding guilt for capital murder, on the one element that distinguished capital murder from murder, while knowing it was the distinguishing element between those two offenses, and knowing that a reasonable doubt on that element required an acquittal of capital murder." *Id*. at 538. The court concluded that it saw "no practical difference between what these instructions required of the jury and what a 'modified acquittal first' and the defendant's proposed 'benefit of the doubt' instruction would have required." *Id.*

## B. Analysis

Here, too, even if we assume without deciding that the trial court should have given the jury a "benefit of the doubt" instruction in addition to either an "acquittal first" or "modified acquittal first" instruction, we similarly conclude that Galvan's case was not harmed as a result.[33]

---

[33] In an opinion this Court issued before *Sandoval*, we concluded that it was not error to fail to include a "benefit-of-the-doubt" instruction where the jury was given an "acquittal first" instruction, the entire charge was read to the jury, and the jury was instructed to consider the charge as a whole in its deliberations. *Kersey v. State*, No. 08-20-00037-CR, 2021 WL 5860920, at *5 (Tex. App.—El Paso Dec. 10, 2021, pet. refused) (not designated for publication). We followed the Austin and Corpus Christi Courts of Appeals that similarly decided the issue. *See Ruiz v. State*, No. 03-19-00551-CR, 2021 WL 3233858, at *5 (Tex. App.—Austin July 30, 2021, no pet.) (mem. op., not designated for publication); *Benavides v. State*, 763 S.W.2d 587, 589 (Tex. App.—Corpus Christi 1988, pet. ref'd). Although we do not read *Sandoval* as overruling this line of cases, we base our decision solely on the harm analysis, as the court did in *Sandoval*.

66

As in *Sandoval,* the jury in Galvan's case was informed about the distinguishing elements of the charged offenses (murder and aggravated assault) and the lesser-included offense (deadly conduct). The jury was instructed more than once that it was required to deliberate on the key issue of whether the State came forward with sufficient evidence to support the elements of the charged offenses; and the instructions made it clear that if the State did not meet its burden of establishing guilt beyond a reasonable doubt—or if the jury believed Galvan's claim of self-defense—the jury was required to acquit Galvan of the charged offenses then consider the lesser offense of deadly conduct. Therefore, the jury charge as a whole left no uncertainty that the jury was required to deliberate on the elements required for each of the offenses, and to acquit Galvan of the charged offenses if it had a reasonable doubt that the State failed to meet its burden of establishing the required elements of those offenses. The benefit-of-the-doubt instruction Galvan requested, while worded differently than the "acquittal first" instruction the jury received, required the jury to do the same thing, i.e., to acquit Galvan of the charged offenses if it had a reasonable doubt as to his guilt of those offenses, and to convict him of the lesser offense if it did *not* have a reasonable doubt as to his guilt of that offense.

As in *Sandoval*, because we do not see the practical difference between the two instructions, we find no harm from the absence of the benefit-of-the-doubt instruction. *Sandoval*, 665 S.W.3d at 538; *see also Delgadillo v. State*, No. 01-23-00736-CR, 2025 WL 2212210, at *19 (Tex. App.—Houston [1st Dist.] Aug. 5, 2025, no pet.) (mem. op., not designated for publication) (finding no harm due to the absence of a benefit-of-the-doubt instruction, where the jury was aware that it was required to acquit the defendant of the charged offense if it had a reasonable doubt of his guilt before deliberating on his guilt of the lesser offense (citing *Villarreal v. State*, No. 05-13-00629-CR, 2014 WL 3056509, at *10 (Tex. App.—Dallas July 7, 2014, no pet.) (mem. op., not designated for publication) ("Failure to include a 'benefit of the doubt' instruction is not harmful

67

to the defendant, however, if the charge as a whole leaves no uncertainty as to how to resolve any doubt.")).

Galvan's Issue Five is overruled.

## VII. CUMULATIVE ERROR

In his fourth issue, Galvan argues that the cumulative force of the errors raised in Issues One and Two (regarding the omissions in the self-defense instruction) and Issue Three (regarding the exclusion of Shutte's testimony) significantly impacted his self-defense claim and merits reversal for a new trial.

The State first responds that the issue is multifarious and should be overruled for that procedural reason. On this point, we disagree. Texas courts recognize in some instances that the cumulative force of multiple errors can compound and require reversal, even if individual errors do not. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (en banc) (explaining as well that unless and until multiple errors are found to have been committed, there can be no cumulative-error effect because non-errors cannot in their cumulative effect create harmful error). The mere existence of multiple errors, however, does not warrant reversal unless the errors operated in concert to undermine the fundamental fairness of the proceedings).

We agree with the State's additional argument that the cumulative force of any errors here did not undermine the fundamental fairness of the trial. As set forth above, we have assumed without deciding that the trial court erred in failing to instruct the jury on the presumption of reasonableness and on the duty to retreat, but we have determined that Galvan was not harmed by the lack of the instructions. We have further found that the trial court did not abuse its discretion in excluding Shutte's expert opinion. Thus, there is no cumulative force of error requiring reversal. *See Murphy v. State*, 112 S.W.3d 592, 607 (Tex. Crim. App. 2003) ("Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate.").

Galvan's Issue Four is overruled.

## VIII. CONCLUSION

Galvan is not entitled to an acquittal on the basis of his speedy trial point of error. Nor is he entitled to a reversal on the basis of the alleged jury-charge errors, the limitation on his expert witness testimony, or the alleged cumulative error.

We affirm the judgment of the trial court.

LISA J. SOTO

March 31, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)